IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, )
                                       )
                                       )
            Plaintiff,                 )
                                       )
vs.                                    ) CASE NO. CR-23-237-SLP
                                       )
                                       )
JEFF WENG and TONG LIN,                )
                                       )
                                       )
            Defendants.                )
                                       )

VOLUME II OF II

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE SCOTT L. PALK

UNITED STATES DISTRICT JUDGE

JANUARY 18, 2024

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

APPEARANCES

FOR THE GOVERNMENT:

      Mr. Wilson D. McGarry
      Mr. David R. Nichols
      Assistant United States Attorney
      U.S. Attorney's Office
      210 West Park Avenue, Suite 400
      Oklahoma City, Oklahoma 73102

FOR THE DEFENDANT JEFF WENG:

      Mr. Todd Henry
      Todd Henry & Associates
      1500 Walnut Street, Suite 1060
      Philadelphia, Pennsylvania 19102

FOR THE DEFENDANT TONG LIN:

      Mr. Jeremy Bennett
      Mr. J. Ken Gallon
      Bennett & Gallon
      105 1st Avenue NE
      Miami, Oklahoma 74354

**INDEX**

PAGE

EVIDENCE ON BEHALF OF THE GOVERNMENT:

CAITLIN AVILES
        Direct Examination By Mr. McGarry................160
        Cross-Examination By Mr. Bennett.................174
        Redirect Examination By Mr. McGarry..............179
        Recross Examination By Mr. Bennett...............180

BRANDON YE
        Direct Examination By Mr. McGarry................183
        Cross-Examination By Mr. Gallon..................211
        Redirect Examination By Mr. McGarry..............222
        Cross-Examination By Mr. Henry...................224
        Recross Examination By Mr. Gallon................228

CHAD VONTUNGELN
        Direct Examination By Mr. McGarry................233
        Cross-Examination By Mr. Bennett.................257

Government rests..................................... 259

Court's reading of the instructions.................. 267

CLOSING ARGUMENTS:
For the government (by Mr. McGarry)................... 284
For Defendant Weng (by Mr. Henry).................... 296
For Defendant Lin (by Mr. Bennett)................... 299
Final for the government (by Mr. McGarry)............ 309

Verdict.............................................. 317

Reporter's certificate............................... 321

1        (The following record was made in open court on January

2   18, 2024, in the presence of all parties, counsel, and in the

3   presence and hearing of the jury.)

4              THE COURT:  Government's next witness.

5              MR. MCGARRY:  The United States calls criminalist

6   Caitlin Aviles, OSBI Controlled Substances Unit.

7        (WITNESS SWORN.)

8              THE COURT:  Ms. Aviles, you can just adjust that

9   microphone a little bit.

10       You may proceed, counsel.

11                          CAITLIN AVILES

12                        DIRECT EXAMINATION

13  BY MR. MCGARRY:

14  *Q.*   Please state your name.

15  *A.*   Caitlin Aviles.

16  *Q.*   And, Ms. Aviles, what do you do for a living?

17  *A.*   I'm a criminalist with the Controlled Substances Unit at

18  the Oklahoma State Bureau of Investigation.

19  *Q.*   And just generally, what is the Oklahoma State Bureau of

20  Investigation?

21  *A.*   It's a state-level investigation law enforcement agency.

22  *Q.*   And how long have you worked as a criminalist for -- can I

23  call it OSBI?

24  *A.*   Yes.

25  *Q.*   How long have you worked for OSBI?

1  A.   Since April of 2022.

2  Q.   And what are your job duties as a criminalist?

3  A.   I analyze submitted evidence for the presence or absence

4  of controlled substances, I generate reports to my findings,

5  and sometimes I testify in court.

6  Q.   Prior to being a criminalist, what did you do?

7  A.   I was both a lab technician and a chemist with a company

8  called ARL Bio Pharma.

9  Q.   Can you tell us about that?

10 A.   As a lab technician, I was responsible for daily duties to

11 keep the lab running smoothly.  I made reagents for the

12 analysts, washed glassware, took care of stock items.

13      As a chemist, I prepared samples for analysis.

14 Q.   How long did you work as a laboratory technician?

15 A.   If I recall correctly, the laboratory technician position

16 was shorter, probably about four or five months.

17 Q.   And how long did you work as a chemist?

18 A.   The remainder of my time I worked there for a year.

19 Q.   And where was this that you worked as a chemist and

20 laboratory technician?

21 A.   ARL Bio Pharma.

22 Q.   And did you have to complete any training in order to

23 become a criminalist?

24 A.   Yes, I did.

25 Q.   Could you describe the training?

1   *A.*   I had in-house training with the OSBI.

2   *Q.*   And what does that consistent of?

3   *A.*   Required reading on the instruments used for analysis,

4   state statutes and other topics, and my training was overseen

5   by a senior criminalist and signed off by a technical manager.

6       After completing the required reading, I was allowed to

7   shadow senior criminalists.  And I had both practice samples

8   and practice cases that were reviewed by other analysts.  And

9   at the end of my training, I took several competency tests and

10  comprehensive exams.

11  *Q.*   When you say there were samples that were reviewed, what

12  do you mean?

13  *A.*   There were samples that were known to be a certain

14  substance, and I did my analysis on them and entered the

15  results.  And the -- I believe it was the technical manager

16  that checked those results, the technical manager and my

17  trainer.

18  *Q.*   And so were you tested on these results and your accuracy?

19  *A.*   Yes.

20  *Q.*   And what -- if you recall, what were the results of those

21  tests?

22  *A.*   I passed.

23  *Q.*   And did you have to take practice tests and samples, is

24  that what you're discussing?

25  *A.*   Yes, prior to the exams at the end.

1  Q.   Okay.  Did you have to achieve a certain competency on

2  these practices, cases and samples?

3  A.   I had to achieve a certain score on the exams at the end.

4  Q.   And did you satisfy those competency requirements?

5  A.   Yes, I did.

6  Q.   And when did you participate in this -- these trainings?

7  A.   My training took place from April 2022 to January 2023.

8  Q.   And are you required to participate in any type of

9  proficiency testing?

10 A.   Yes, I am.

11 Q.   What is proficiency testing?

12 A.   Proficiency testing is a test that is given to the

13 analysts to ensure that they're continuing to perform to

14 standards.

15 Q.   And what are those standards?

16 A.   Accurate results in analysis.

17 Q.   And how often do you have to participate in those

18 proficiency testings?

19 A.   At least once a year.

20 Q.   And have you been consistent with that?

21 A.   Yes.

22 Q.   And what is your current proficiency status?

23 A.   I was given a proficiency test in September and I passed

24 it.

25 Q.   Tell us a little bit about your education.  Where did you

1  attend undergrad?

2  *A.*  I got my bachelor of science in chemistry from Michigan

3  State University.

4  *Q.*  Do you have any post-graduated degree?

5  *A.*  Yes, I do.

6  *Q.*  What is that in?

7  *A.*  I have a master of science from University of Florida in

8  forensic toxicology.

9  *Q.*  Now, as a chemist at OSBI, do you work in a lab?

10  *A.*  Yes, I do.

11  *Q.*  Is the OSBI lab accredited?

12  *A.*  Yes.

13  *Q.*  By whom?

14  *A.*  It's accredited by ANAB, which stands for ANSI National

15  Accreditation Board.

16  *Q.*  And have you testified as an expert before?

17  *A.*  Yes.

18  *Q.*  How many times?

19  *A.*  Twice.

20  *Q.*  In your role as a criminalist for OSBI, do you routinely

21  analyze items for the presence or absence of controlled

22  substances?

23  *A.*  Yes.

24  *Q.*  What is the process you use to determine if a controlled

25  substance is present in an item?

1   A.    When I receive evidence, I open -- I inspect the evidence

2   envelope, and then I open it, inventory the items that are

3   inside, and then I work each item one at a time.  And that

4   involves taking a weight and then taking a sample for

5   instrumental analysis.

6        Once I gather the data from the instrumental analysis, I

7   make my determinations and write my report.  My report is sent

8   out for peer review.

9   Q.    So what are the methods and procedures and instruments

10  that you use and how do you use them?

11  A.    I use net weight, which involves the weight of the sample

12  without the packaging.  And then I use gas chromatography and

13  gas chromatography with mass spectrometry.

14  Q.    And do you abbreviate the gas -- I can't even pronounce

15  it.  Is it called GGC, is the best way to refer to it?

16  A.    Yes, but I would like to add that I also did a microscopic

17  examination.

18  Q.    And what's that?

19  A.    It involves looking at a sample under a microscope.

20  Q.    And when you do all this, do you -- how do you ensure that

21  your equipment and findings are accurate?

22  A.    We have a software system.  And as I work the item, I

23  input the information as I'm working the item.  And on the

24  instruments, we have a -- a number of quality controls.  And

25  that starts from broad, so monthly tests, down to routine

1  maintenance, down to daily checks, down to more specific

2  things, such as a -- checks within specific cases.

3  Q.    So do you have a standard operating procedure that ensures

4  reliability?

5  A.    Yes, we have policies and procedures.

6  Q.    And you mentioned this GC, as I kind of referred to it.

7  Could you explain what that is?

8  A.    GC is an instrument that separates the components of an

9  unknown sample.

10  Q.    And could you describe how that works?

11  A.    It's a presumptive analysis, so it gives you an idea of

12  what you could be working with.

13        And it works -- the sample is injected into the instrument

14  and it moves onto a column that is in an oven that temperature

15  ramps over time.  And depending on the characteristics of the

16  compounds, they'll move through the column at different paces,

17  and they hit the detector.  And I use that time from when it's

18  injected to when it's detected to get a retention time, and I

19  compare that to a known standard to get an idea of what might

20  be in the sample.

21  Q.    And are you trained to use that instrument?

22  A.    Yes, I am.

23  Q.    Did you have to pass a proficiency test on using it?

24  A.    Yes.

25  Q.    And when did you last take that test?

1    *A.*    That was in September.

2    *Q.*    Okay.  And you passed?

3    *A.*    Yes.

4    *Q.*    What about the microscope you mentioned using, do you

5    have -- are you trained to use it?

6    *A.*    Yes, I am.

7    *Q.*    And do you have to take a test on your proficiency of

8    using that?

9    *A.*    No, but during training I was trained by a senior

10   criminalist and I had to identify the presence or absence of

11   characteristics of a plant for 25 samples.

12   *Q.*    And were there results from that test or samples that you

13   did?

14   *A.*    Yes.

15   *Q.*    And did you pass?

16   *A.*    Yes, I did.

17   *Q.*    How many controlled substance analyses have you conducted

18   as a criminalist for OSBI?

19   *A.*    When I checked recently, I had closed approximately 770

20   cases.

21   *Q.*    And when you say "cases," are there multiple tests within

22   a case, or could you tell us about that?

23   *A.*    Yes.  Some cases have multiple testing.  So I did 770, but

24   each case could have multiple items.

25   *Q.*    So you did 770 cases?

1  *A.*   Like overall is the cases, and then some cases have

2  individual items.

3  *Q.*   So you have tested more items than actual number of cases?

4  *A.*   Yes.

5  *Q.*   And out of all these cases and tests that you have

6  conducted, have you analyzed -- or conducted marijuana tests?

7  *A.*   Yes, I have.

8  *Q.*   And how many tests have you performed where marijuana is

9  the substance that you're analyzing?

10 *A.*   Approximately 250 of my cases have involved cannabis.  If

11 we're talking individual items, I believe that number is

12 approximately 800.

13 *Q.*   Are the methods of testing used in the OSBI lab that you

14 apply commonly used by other criminalists?

15 *A.*   Yes, they are.

16 *Q.*   Are the testing and practices you use widely accepted in

17 the scientific community?

18 *A.*   Yes.

19 *Q.*   Were you asked to conduct an examination of an item for

20 this case to determine whether it had the presence of a

21 controlled substance?

22 *A.*   Yes, I was.

23 *Q.*   And how did you become involved in the case, just

24 generally?

25 *A.*   There case was assigned to me by a supervisor.

1  *Q.*   And were you provided the item to test?

2  *A.*   Yes.

3  *Q.*   How was that done?

4  *A.*   The supervisor assigns our cases to us.  And I take the

5  submission forms and I go into our property room and I use the

6  OSBI lab number to pull the evidence envelopes from our drug

7  property room.  And then there is a bar code along with that

8  lab number, and I scan them into my custody.

9  *Q.*   You mentioned this bar number.  Does OSBI have any policy

10 or procedure to ensure the custody and maintenance of any of

11 the items you receive?

12 *A.*   Yes, we do.

13 *Q.*   Could you just generally describe what those policies are?

14 *A.*   We have a laboratory tracking software.  And when evidence

15 is received down by the evidence technicians, it's assigned a

16 unique OSBI case number and a bar code, and that's put on the

17 submission form and the envelope.

18      And every time the evidence is moved, whether it's between

19 an analyst or a location, we all have assigned bar codes and we

20 scan that every time the evidence is moved through the building

21 or changes hands.

22 *Q.*   And what's the purpose of this?

23 *A.*   So that it tracks it to our laboratory system and we can

24 ensure who had it, where it was.

25 *Q.*   For chain of custody?

1  *A.*   Yes.

2  *Q.*   And did you follow those -- those policies here in this

3  case?

4  *A.*   Yes, I did.

5        MR. MCGARRY:  If I could, Your Honor, approach with

6  Government's Exhibit 405?

7        THE COURT:  You may.

8  *Q.*   (BY MR. MCGARRY)  I have handed you what's been marked as

9  Government's Exhibit 405.  Do you recognize it?

10  *A.*   Yes, I do.

11  *Q.*   How do you recognize it?

12  *A.*   My initials and the date and the case number are on this

13  bag from when I opened it.

14  *Q.*   Is the substance inside this package the sample that you

15  examined for this case?

16  *A.*   Yes.

17  *Q.*   And how do you know this?

18  *A.*   Because of my -- the information that I wrote on this bag

19  both when I opened it and when I sealed it back up.

20  *Q.*   And when you wrote on this, did you write on this in order

21  to note that you reviewed this and also to track it?

22  *A.*   Yes.

23  *Q.*   And did you provide it with a certain label or number to

24  keep track of it?

25  *A.*   Yes, I did.

1  Q.   And what was that number?

2  A.   Item 1E3 for OSBI case 237739.

3  Q.   And was the sample contained in this bag a leafy green

4  substance?

5  A.   Yes.

6  Q.   And tell us, did you apply the testing method you

7  described earlier to this sample?

8  A.   Yes.  I did a net weight, a microscopic visual exam and

9  analysis with gas chromatography and gas chromatography mass

10  spectrometry.

11  Q.   And what are you looking for while you're testing this

12  sample?

13  A.   Under the microscope I'm looking for cystolithic hairs.

14  Q.   What's that?

15  A.   It is a characteristic of marijuana, but not unique to it.

16  And it's a hair that is clear and shaped like a bear claw with

17  a bulbous base.

18  Q.   So why are you looking for that?

19  A.   It's characteristic to marijuana, but not unique.  So it's

20  another presumptive test that we do.

21  Q.   And what does that presumptive test tell you?

22  A.   The presence or absence of cystolithic hairs.

23  Q.   And so when you analyzed this substance, what was the

24  result of that presumptive test?

25  A.   Positive.

1    *Q.*    Positive for what?

2    *A.*    Cystolithic hairs.

3    *Q.*    Meaning what?

4    *A.*    I found a cystolithic hair over the course of my

5    microscopic exam.

6    *Q.*    Which indicates that it's a controlled substance?

7    *A.*    It could be a controlled substance.

8    *Q.*    And did you draft a report containing your findings for

9    your analysis of this sample?

10   *A.*    Yes, I did.

11   *Q.*    And you have a book in front of you.  If you could, turn

12   to Government's Exhibit 404.

13          Do you recognize that?

14   *A.*    Yes, I do.

15   *Q.*    How do you recognize that?

16   *A.*    This is my criminalistics examination report, and I

17   recognize my signature at the bottom of this page.

18   *Q.*    So is that a fair and accurate copy of the report you

19   drafted for this case?

20   *A.*    Yes, it is.

21          MR. MCGARRY:  Your Honor, I would move for the

22   admission of Government's Exhibit 404.

23          THE COURT:  Any objection?

24          MR. HENRY:  No objection, Your Honor.

25          MR. BENNETT:  No, Your Honor.

1          THE COURT:  404 will be admitted without objection

2    and you may publish at will, counsel.

3          (Exhibit published to the jury.)

4    Q.   (BY MR. MCGARRY)  Now, what item number did you say that

5    you provided for this sample that you tested?

6    A.   I assigned this item 1E3.

7          MR. MCGARRY:  If we could zoom in on that part.

8    Q.   (BY MR. MCGARRY)  So just tell us what we see here.

9    A.   Item 1E3 is one paper bag, item No. 33, containing a green

10   leafy substance, net weight 0.34 grams.

11   Q.   And just tell us the process of your analysis on this

12   item.

13   A.   On this item, I initialed and dated, cut into the bag,

14   took my net weight, took a sample for analysis -- sorry.  I did

15   a microscopic examination first and I found cystolithic hairs.

16        I took a sample for analysis, and I put that sample on the

17   gas chromatograph and gas chromatograph mass spectrometer.

18   Q.   And then what?

19   A.   Once I got all of the data, I looked at it and I made my

20   determinations.  I wrote my report and sent it off for peer

21   review by another analyst.

22          MR. MCGARRY:  If we could look down at the bottom

23   of this.

24   Q.   (BY MR. MCGARRY)  Does this show your result in this -- of

25   your analysis here, kind of the results --

1   *A.    Yes, it does.*

2   *Q.    And so what were your results of testing this sample?*

3   *A.    The results were cannabis, marijuana, containing*

4   tetrahydrocannabinol Schedule I.

5   *Q.    What does that mean in layman's terms?*

6   *A.    It was found to be marijuana.*

7   *Q.    So in the end, did your test find the sample was, in fact,*

8   a marijuana leaf?

9   *A.    Yes.*

10          MR. MCGARRY:  One moment, Your Honor.

11      Pass the witness, Your Honor.

12          THE COURT:  Cross-examination?

13          MR. HENRY:  I have no questions.

14          THE COURT:  Mr. Bennett.

15                    CROSS-EXAMINATION

16  BY MR. BENNETT:

17  *Q.    Ms. Aviles.*

18  *A.    Aviles.*

19  *Q.    Aviles.  Okay.*

20      All right.  Ms. Aviles, we talked about the testing and

21  you kind of gave a rundown of what you do.

22      So the first thing I want to go into is you talk about the

23  presumptive positive test.

24  *A.    Yes.*

25  *Q.    What's a presumptive positive test?*

1  *A.*   A presumptive test gives you an idea of what you might be

2  working with, and then we pair that with a confirmatory test.

3  *Q.*   Okay.  So whenever we're talking about a presumptive

4  positive, that is a test that gives us an idea, but it's not

5  definitive.  Would you agree to that?

6  *A.*   Correct.

7  *Q.*   So this would be similar to the tests that law enforcement

8  does on the roadside, like a reagent test.  Would you agree

9  with that?

10  *A.*   I would not say that it's the same as a color test.

11  *Q.*   I'm not saying you're doing the exact same test.  I'm just

12  saying that's an example people might be familiar with a

13  presumptive positive?

14  *A.*   Yes.

15  *Q.*   Because on that type of presumptive positive the reagent

16  reacts with whatever controlled substance is there and says

17  this is present or this is not, but it doesn't give any more

18  information on anything else?

19  *A.*   Correct.

20  *Q.*   Okay.  So you talked about the accreditation that you went

21  through and your training.

22         During your training, were you -- did you receive any

23  training on industrial hemp?

24  *A.*   We have policies and procedures that I read regarding it.

25  *Q.*   Okay.  What are your policies and procedures involving

1  that?

2  A.   We have policies and procedures for -- because we don't

3  quantify, we have policies and procedures for when we can call

4  something cannabis versus when it would be considered delta-9,

5  THC.

6  Q.   And what's that policy when you can call one or the other?

7  A.   When I run samples on the gas chromatograph and the gas

8  chromatograph mass spectrometer, for example another compound

9  that can be green leafy is cannabidiol.  According to our

10 policies, if the peak on those instruments is twice as abundant

11 as the THC peak, we would be able -- we would be able to call

12 it delta-9 THC containing -- and then cannabidiol rather than

13 cannabis.

14 Q.   So you're comparing those two peaks, and that's what

15 you're doing to try to establish that this is marijuana or this

16 is not.  Agreed?

17 A.   If a different compound is present besides THC that is

18 more abundant, yes.

19 Q.   Okay.  And in your training did they give you a definition

20 of what is marijuana and what is industrial hemp?

21 A.   I don't recall.  I don't recall the exact definition.

22 Q.   Okay.  Let me ask you this, and maybe this will help

23 refresh your memory, would you agree that industrial hemp is

24 defined as any part of the cannabis plant that contains up to

25 .3 percent THC level and marijuana would be anything above

1   .3 percent?

2   *A.*   I believe that sounds correct.  I would have to look at

3   the state statutes again, but the .3 percent sounds correct.

4   *Q.*   I understand.

5        Okay.  And I notice here on this report in Exhibit 404 it

6   says "quantitation was not performed."

7        What's quantitation?

8   *A.*   Quantitation would be the concentration of a sample.

9   *Q.*   So it tells how much THC is present, agreed, if you do a

10  quantitative analysis?

11  *A.*   Yes.

12  *Q.*   Okay.  So in that instance, you put your sample in, it

13  gases off, you read it, and then you would have this has .5 THC

14  or .2 THC or whatever that result is, or ten percent THC,

15  correct, if you did quantitative?

16  *A.*   I'm not -- or my instruments aren't quantitative.  I'm not

17  trained on quantitative instruments.

18  *Q.*   Okay.

19  *A.*   But I believe that sounds correct.

20  *Q.*   Okay.  So you have no training on quantitative analysis?

21  *A.*   We don't have quantitative instruments at the lab.

22  *Q.*   Okay.  So when you do this report, you can't tell me that

23  this sample as .2 percent; correct?

24  *A.*   Correct.

25  *Q.*   You can't tell me that it's .4 percent; correct?

1  *A.*   Correct.

2  *Q.*   We can't take this lab report and your testimony and

3  determine what the THC level is in any of these samples, would

4  you agree?

5  *A.*   Correct, I cannot give a numerical amount.

6  *Q.*   Okay.  Next question, microscopic analysis.  All right.

7  So essentially what you're doing is a visual inspection with

8  the aid of magnification through a microscope; correct?

9  *A.*   Correct.

10 *Q.*   And I heard you earlier say that that's a presumptive test

11 because you're looking for those hairs; correct?

12 *A.*   Correct.

13 *Q.*   And there's other substances that have those same hairs,

14 is that what I gathered?

15 *A.*   Yes.

16 *Q.*   What kind of substances have those hairs?

17 *A.*   I don't know off the top of my head, but there are other

18 plants that do have cystolithic hairs.

19 *Q.*   Would industrial hemp be one of those plants?

20 *A.*   I believe so.

21 *Q.*   Okay.  And the reason that's a presumptive positive test

22 is you can't definitively say based on a visual inspection

23 whether something is marijuana or whether something's hemp.

24 Agreed?

25 *A.*   Agreed.

1    Q.   Okay.  So if somebody testified and said I can visually

2    look at this and I can tell this is marijuana by the smell or

3    the appearance, you would disagree with that?

4    A.   I would not make that assumption.

5    Q.   Because it would be an assumption?

6    A.   I would not say that without running further instrumental

7    analysis.

8    Q.   Because I'm guessing you have never done one of these

9    reports and said, well, I just looked at it and this is

10   marijuana?

11   A.   Correct.

12   Q.   Okay.  All right.  So in your opinion, a visual analysis

13   alone would not be sufficient to scientifically say this is

14   marijuana, a controlled dangerous substance?

15   A.   Per our policies and procedures, I am not allowed to do

16   that.

17   Q.   Okay.

18           MR. BENNETT:  Nothing further.

19           THE COURT:  Redirect?

20                   REDIRECT EXAMINATION

21   BY MR. MCGARRY:

22   Q.   Ms. Aviles, you did more than just presumptively test the

23   sample; right?

24   A.   Correct.

25   Q.   So is this hemp or marijuana?

1  *A.*   I found this sample to be cannabis, marijuana containing

2  tetrahydrocannabinol Schedule I.

3  *Q.*   And that was the result of your test?

4  *A.*   Correct.

5            MR. MCGARRY:  No further questions, Your Honor.

6            THE COURT:  Any additional cross, Mr. Henry?

7            MR. HENRY:  I have none.

8            THE COURT:  Mr. Bennett?

9            MR. BENNETT:  Very briefly, Your Honor.

10                      RECROSS EXAMINATION

11  BY MR. BENNETT:

12  *Q.*   Ma'am, you just testified that you found it was cannabis

13  marijuana --

14  *A.*   Yes.

15  *Q.*   -- containing THC?  What's that THC level amount?

16  *A.*   I don't have a numerical amount.

17            MR. BENNETT:  Nothing further.

18            THE COURT:  Any reason why this witness may not be

19  excused?

20            MR. MCGARRY:  No, Your Honor.

21            MR. HENRY:  No, Your Honor.

22            THE COURT:  Mr. Bennett?

23            MR. BENNETT:  No, Your Honor.

24            THE COURT:  Okay.  Thank you for your testimony,

25  ma'am.  You may step down and be excused.

1      Government's next witness.

2              MR. MCGARRY:  The United States calls Brandon Ye.

3      (The following bench conference was held outside the hearing

4  of the jury.)

5              MR. HENRY:  May I ask to put on some white noise

6  just for one second?

7              THE COURT:  Actually, just -- before we start,

8  before your question, Mr. McGarry, Mr. Ye is in custody, is he

9  not?

10             MR. MCGARRY:  Yes, Your Honor.

11             THE COURT:  The marshals have him here and --

12             MR. MCGARRY:  They should.  I have alerted them

13 that he could begin his testimony as early as 9:30.  I haven't

14 had an opportunity to check on that this morning yet, though.

15             THE COURT:  Okay.

16             MR. MCGARRY:  Frankly, I -- do you need me to?  I

17 don't really know what the procedure is on that.

18             THE COURT:  No.  Marcia will call down and have him

19 brought up if he's down in the holdover.

20      Anyway, I'm sorry.  Go ahead, Mr. Henry.

21             MR. HENRY:  Mine is just a logistical question on

22 how the translators are going to translate to English so we

23 understand what Mr. Ye is saying.  That's my question.

24             THE COURT:  Marcia, illuminate us.

25             MS. SEALE:  One of them will go up there and

```
 1    translate.
 2              MR. HENRY:  That sounds good.  I don't think
 3    they're aware of that.
 4              THE COURT:  Perfectly legitimate question.  Nor was
 5    I.
 6              MR. HENRY:  That's all I have.
 7         (The following record was made in open court, in the
 8    presence of all parties, counsel, and in the presence and
 9    hearing of the jury.)
10              THE COURT:  Ladies and gentlemen, while the next
11    witness is on his way, feel free to stand up and stretch if you
12    want to.
13         Counsel, as Mr. Ye is on his way up, I would remind all of
14    you that please be sure in your questioning that you build in a
15    little bit of delay so there's sufficient opportunity for the
16    translators to actually make their translation.
17         (WITNESS SWORN.)
18              THE COURT:  Mr. Ye, are you able to hear the
19    translator provide these translations?
20              THE WITNESS:  Yes.
21              THE COURT:  If at any time you are not able to
22    understand something or hear something, or need something
23    repeated, if you would just please let me know and we can do
24    so.
25              THE WITNESS:  I will.
```

1        THE COURT:  You may proceed, counsel.

2                      BRANDON YE

3                   DIRECT EXAMINATION

4   BY MR. MCGARRY:

5   Q.   What is your name?

6   A.   Brandon Ye.

7   Q.   Where were you born?

8   A.   China.

9   Q.   Is Mandarin your native or primary language?

10  A.   Yes.

11  Q.   When did you come to the United States?

12  A.   2000.

13  Q.   How long have you lived in the United States?

14  A.   24 years.

15  Q.   Do you speak English?

16  A.   Just a little.

17  Q.   Are you more comfortable speaking in Mandarin?

18  A.   Yes.

19  Q.   What is the address of your most recent residence in the

20  United States?

21  A.   4604 Northwest 30.

22        THE INTERPRETER:  Your Honor, can I go ahead and

23  ask the witness to move his microphone in front of him, that

24  way I can hear him better?  Thank you.

25        THE COURT:  Thank you.

1  Q.    (BY MR. MCGARRY)   Is that in Oklahoma City?

2  A.    Yes.

3  Q.    How long did you live there?

4  A.    2018, so it's about approximately three to four years.

5  Q.    At any time did you live at an address in Oklahoma City on

6  12th Street?

7  A.    Correct.

8  Q.    When did you live there?

9  A.    Starting in 2018.

10 Q.    And how long did you live there?

11 A.    Well, four years.

12 Q.    And up until when?  Do you know the date?

13 A.    Up until the week that I was arrested.

14 Q.    So are you in federal custody?

15 A.    Correct.

16 Q.    When were you arrested and taken into federal custody?

17 A.    I was arrested, well, March 31st, the year 2023.  Then, I

18 was arrested.

19 Q.    What crimes were you originally charged with?

20 A.    Conspiracy for the -- for the marijuana and the

21 dealership, or the selling.

22 Q.    Were you charged with anything else?

23 A.    Illegal possessions of weapon.

24 Q.    Do you have a plea agreement with the government?

25 A.    Yes.

1   *Q.*   What crimes did you plead guilty to?

2   *A.*   Possession of marijuana and illegal possessions of

3   weapons.

4   *Q.*   Was that possession of marijuana with intent to

5   distribute?

6   *A.*   Correct.

7   *Q.*   And possession of a firearm in furtherance of a

8   drug-trafficking crime?

9   *A.*   Correct.

10   *Q.*   Mr. Ye, do you want to be here today?

11   *A.*   Yes.

12   *Q.*   Could you tell us why?

13   *A.*   I want to help myself, to tell the truth for the case.

14   *Q.*   And has anybody promised you that this is going to help

15   you or promised you leniency?

16   *A.*   No.

17   *Q.*   Has the government promised you anything for your

18   testimony today?

19   *A.*   No.

20   *Q.*   Has the government told you what to say?

21   *A.*   No.

22   *Q.*   What do you hope to get out of this by testifying today?

23   *A.*   To reduce my sanctions or crime.

24   *Q.*   And you said you're testifying to help yourself.  So you

25   mean that by testifying you hope to get a reduced sentence by

1   this testimony?

2   *A.*   Correct.

3   *Q.*   But has anyone promised you this?

4   *A.*   No.

5   *Q.*   Even though you hope to get leniency, do you intend to

6   tell the truth today?

7   *A.*   Correct.

8   *Q.*   Have you lied in the past?

9   *A.*   I don't think so.

10  *Q.*   Have you had any trouble remembering events?

11  *A.*   So if the event happened so long ago, then the memory

12  could be vague.

13  *Q.*   You said you pled guilty; right?  What made you change

14  your mind to plead guilty?

15  *A.*   I think that I have make mistake.

16  *Q.*   Did you plead guilty to the crime you're charged with

17  because you did it?

18  *A.*   Correct.

19  *Q.*   Is anyone making you be here today?

20  *A.*   No.

21  *Q.*   Have you ever been convicted of a felony before?

22  *A.*   No.

23  *Q.*   Do you have any other criminal history?

24  *A.*   No.

25  *Q.*   Traffic tickets?

1    *A.*    Long time ago, since like -- long time ago, since like...

2    *Q.*    So it's been a long time?

3    *A.*    Quite a few years, that's correct.

4    *Q.*    So you pled guilty to possession with intent to distribute

5    and possession of a firearm in furtherance of a

6    drug-trafficking crime; right?

7    *A.*    Correct.

8    *Q.*    Tell the jury, what were you doing to be charged with and

9    plead guilty to those crimes?

10   *A.*    What I did was using the fake Amazon truck to transport

11   marijuana to the factory.

12   *Q.*    So you were transporting marijuana?

13   *A.*    Correct.

14   *Q.*    When did you start doing this?

15   *A.*    In the April of 2022.

16   *Q.*    When you first started picking up marijuana, what type of

17   vehicle did you initially use?

18   *A.*    It is a white vehicle that had been used for my granite

19   company.

20           MR. MCGARRY:  At this time, Your Honor, the

21   government would move to admit Government's Exhibit 200 to 213.

22   I believe these are part of the agreed exhibits between the

23   government and the defense.

24           THE COURT:  I believe 200 to 213 are in, counsel.

25           MR. MCGARRY:  I'm sorry.

```
 1              THE COURT:  Do you agree with that, counsel?

 2              MR. HENRY:  Yes, Your Honor.

 3              MR. GALLON:  Yes, Your Honor.

 4              MR. MCGARRY:  Thank you, Your Honor.

 5         Can we pull up Government's Exhibit 200, please?

 6         (Exhibit published to the jury.)

 7    Q.   (BY MR. MCGARRY)  Do you recognize this?

 8    A.   Yes.

 9    Q.   What do we see here?

10    A.   My residence, as well as my company's car.

11    Q.   Is that the van you initially used to pick up marijuana?

12    A.   Yes.

13    Q.   And what's the name on the side of the van?

14    A.   Arch Granite Cabinetry.

15    Q.   If you could, just pull the microphone a little bit closer

16    so we can all hear you.

17    A.   Arch Granite and Cabinetry.

18    Q.   What about that house, do you recognize it?

19    A.   That is where I resided.

20    Q.   And what's the address of that residence?

21    A.   That is 4604 Northwest 12th.

22    Q.   In Oklahoma City?

23    A.   Yes.

24    Q.   So when you started picking up marijuana, that's the van

25    you used in Government's Exhibit 200?
```

1   A.   Correct.

2   Q.   And after a few months, did you purchase a different van

3   to use also to pick up marijuana?

4   A.   Yes.

5   Q.   Let's look at Government's Exhibit 201.

6        (Exhibit published to the jury.)

7             THE INTERPRETER:  Your Honor, can we have a moment,

8   please?

9             THE COURT:  Yes.

10            THE INTERPRETER:  May the interpreter approach?

11            THE COURT:  Sure.  I'm sorry.  Yeah, sure.

12       (Interpreter moved closer to the witness.)

13            MR. MCGARRY:  Do you want me to proceed?

14            THE COURT:  You can proceed.

15            MR. MCGARRY:  Okay.

16  Q.   (BY MR. MCGARRY)  So is this the vehicle that you

17  purchased after a few months to use to transport marijuana?

18  A.   Yes.

19  Q.   Did you have it painted or do anything to it to make it

20  look like an Amazon van?

21  A.   The logo was sticked to it later on by me.

22  Q.   You did it?

23  A.   I hired people.

24  Q.   Did you ever work for Amazon?

25  A.   No.

1  *Q.*   Why did you disguise this van to look like an Amazon
2  delivery van?
3  *A.*   Because my boss told me a vehicle like this would be
4  safer.
5  *Q.*   And when did you start using this fake Amazon delivery van
6  to pick up marijuana?
7  *A.*   Since May 2022.
8  *Q.*   So was this disguised as a fake Amazon delivery van to
9  avoid law enforcement detection?
10  *A.*   Yes.
11  *Q.*   And how long did you use this fake Amazon van to transport
12  and pick up marijuana?
13  *A.*   All the way until the day I was arrested.
14  *Q.*   And while you used that fake Amazon delivery van, did you
15  also continue to use the other company van that we showed you
16  to pick up marijuana sometimes?
17  *A.*   Yes.
18  *Q.*   Tell the jury what you would do in a typical day or week
19  when you would go and pick up marijuana.
20  *A.*   In the morning I would take off from my house, then I
21  would go to the grow.  And after I loaded -- after the
22  marijuana was loaded, I then would go back to the city.
23  *Q.*   So you would start from your house every morning?
24  *A.*   Yes.
25  *Q.*   And where would you drive this fake Amazon delivery van

1    to?

2    *A.*    The other house, Ling house.

3              MR. HENRY:  Your Honor, I hate -- should we

4    should -- a logistical thing, it's not --

5         (The following bench conference was held outside the

6    hearing of the jury.)

7              THE COURT:  Got everybody?

8              MR. HENRY:  Yes.

9              MR. MCGARRY:  Yes.

10             MR. HENRY:  I don't think our clients can hear his

11   Mandarin responses, and they don't understand the English

12   because nobody's translating to them what -- what the

13   translator is saying he's saying.

14        So either he needs to speak louder or can we have this

15   translator translate to them?  I'm just worried they don't know

16   what's going on.

17             THE COURT:  I hate to do the trouble translation.

18        Marcia, what if -- since they're kind of sharing that

19   microphone, what about the cordless mic?  If he spoke into the

20   mic at the desk and the translator spoke into the cordless mic,

21   would that work?

22             MS. SEALE:  Yeah, we can try that.

23             THE COURT:  Let's try that and see.

24             MR. HENRY:  Just don't want it to come back that

25   they didn't hear what was going on.

1          MR. MCGARRY:  That's fine.  Logistically, I do

2    like -- I think it's going better with her up there.

3        (The following record was made in open court, in the

4    presence of all parties, counsel, and in the presence and

5    hearing of the jury.)

6          THE COURT:  I agree.  We're going to get you the

7    cordless mic so that they're able to hear both his answer and

8    your translation.

9          THE INTERPRETER:  Thank you, Your Honor.

10          THE COURT:  I'm learning.

11        Ladies and gentlemen, if there's ever any time that you

12    aren't able to hear the translation, I know it wouldn't

13    necessarily be any good to hear the answer of the witness, but

14    if you weren't able to hear the translation, if you would

15    signal me or let me know and we'll continue to try to tweak the

16    system a little bit.

17        So anyway, you may proceed, counsel.

18          MR. MCGARRY:  Thank you.

19    Q.   (BY MR. MCGARRY)  So I believe you were saying that you

20    would drive this fake Amazon van to go pick up marijuana from

21    marijuana grows; is that correct?

22    A.   Yes.

23    Q.   And would you go to one farm?

24    A.   No.

25    Q.   Would you go to different farms?

1   *A.*   Yes.

2   *Q.*   Where were the -- they located?

3   *A.*   Around Oklahoma City.

4   *Q.*   Would you go outside of the Oklahoma City area as well?

5            MR. GALLON:  Object.

6            THE WITNESS:  Yes.

7      (The following bench conference was held outside the hearing

8   of the jury.)

9            THE COURT:  Mr. Gallon, did you have an objection?

10           MR. GALLON:  Yes, Your Honor.  He's leading the

11  witness.

12           THE COURT:  For these foundational purposes and

13  with the getting past the translator issue, I'm going to give

14  him some leeway.

15       But I will caution you, Mr. McGarry, do be careful about

16  leading as we get into some more material areas.  I'll let you

17  proceed foundationally, but please be mindful of that.

18       Mr. Gallon, if you have an additional objection as we move

19  forward, feel free to raise that again.

20           MR. MCGARRY:  Understood, Your Honor.

21           MR. GALLON:  I would also say that on this

22  particular -- he has asked and answered the question, and so

23  I'm objecting to any other questions about what he's done.  He

24  answered the question that he picked up around Oklahoma City,

25  and so now he's trying to -- I mean, the question's been asked

1   and answered.

2          THE COURT:  Overruled.

3       (The following record was made in open court, in the

4   presence of all parties, counsel, and in the presence and

5   hearing of the jury.)

6   *Q.*   (BY MR. MCGARRY)  What would you do once you picked up

7   marijuana from a marijuana farm?

8   *A.*   I would then transport them back to the city.

9   *Q.*   And where would you take it?

10  *A.*   The warehouse on Linn Avenue or Linn Street.

11          MR. MCGARRY:  Let's look at Government's

12  Exhibit 202, please.

13       (Exhibit published to the jury.)

14  *Q.*   (BY MR. MCGARRY)  Mr. Ye, what do we see here?

15  *A.*   This is the house I would store the marijuana at.

16  *Q.*   Is this the Ling house you just mentioned?

17  *A.*   Yes.

18  *Q.*   Once you started picking up marijuana, how often were you

19  making trips to pick up and transport marijuana?

20  *A.*   Four or five times weekly.

21  *Q.*   And how many total different marijuana grows did you go to

22  in a given week, if you can tell us?

23  *A.*   It varied.

24  *Q.*   Could you give us an estimate?

25  *A.*   Four or five.

1   Q.   And were there any similarities in these farms that you

2   would go to?

3   A.   They're all operated by Chinese nationals.

4   Q.   Were you paid for transporting and picking up the

5   marijuana?

6   A.   Yes.

7   Q.   How much were you paid?

8   A.   It varied.  The average would be $15 per pound.

9   Q.   When you picked up marijuana from a farm, how is it

10  usually packaged?

11  A.   Usually they would be package it in black trash bags, or

12  sometimes in boxes like from Home Depot.

13  Q.   Like cardboard boxes?

14  A.   Yes.

15  Q.   Look at Government's Exhibit 203, please.  Is this how it

16  would be packaged?

17       (Exhibit published to the jury.)

18            THE WITNESS:  Yes.

19  Q.   (BY MR. MCGARRY)  Would the boxes be closed when you would

20  pick them up?

21  A.   Yes.

22  Q.   So when you picked up the marijuana, how did you know you

23  were picking up marijuana?

24  A.   This is what I do.  It's my job.

25  Q.   You said you were arrested on March 31st, 2003; right?

1   *A.    Yes.*

2   *Q.    After your arrest, did you meet with the government*

3   *several times to tell us about the various marijuana grows that*

4   *you would go to?*

5   *A.    Yes.*

6   *Q.    Was one of the marijuana farms that you picked up from*

7   *located in Wetumka, Oklahoma?*

8            MR. BENNETT:  Your Honor, object.

9            THE COURT:  Overruled.

10           THE WITNESS:  Yes.

11  *Q.    (BY MR. MCGARRY)  At first did you recall not going to*

12  *that marijuana grow when you met with us?*

13  *A.    Yes.*

14  *Q.    Do you remember why you couldn't remember it?*

15  *A.    The photo shown to me did not have the white color garage*

16  *door.*

17           MR. MCGARRY:  Let's look at Government's

18  Exhibit 205, please.

19           THE WITNESS:  Warehouse.

20      (Exhibit published to the jury.)

21  *Q.    (BY MR. MCGARRY)  Is this the photo that was initially*

22  *shown to you?*

23  *A.    Yes.*

24  *Q.    And when you saw this, is this -- seeing this is when you*

25  *told us you couldn't remember going to the marijuana farm in*

1  Wetumka?

2  *A.*  Yes.

3  *Q.*  At another meeting were you shown a different photo which

4  jogged your memory of having gone to the grow in Wetumka?

5  *A.*  Yes.

6         MR. MCGARRY:  Let's look at Government's

7  Exhibit 204.

8       (Exhibit published to the jury.)

9  *Q.*  (BY MR. MCGARRY)  What do we see here?

10 *A.*  The farm.

11 *Q.*  Is this the photo that jogged your memory about visiting

12 the marijuana grow in Wetumka, Oklahoma?

13 *A.*  Yes.

14 *Q.*  After you saw this, did you recall going to this grow?

15 *A.*  Yes.

16        MR. MCGARRY:  Let's look at Government's

17 Exhibit 300, please.

18      (Exhibit published to the jury.)

19 *Q.*  (BY MR. MCGARRY)  What do we see here?

20 *A.*  The front entrance.

21 *Q.*  Of the grow?

22 *A.*  Yes.

23 *Q.*  When did you first go to this marijuana grow?

24 *A.*  Approximately in December of 2022.

25 *Q.*  When did you last go to this grow?

1  *A.*   The week before I was arrested.

2  *Q.*   So between December of 2022 and March 31st of 2023, when

3  you were arrested, how many times did you go to this grow?

4  *A.*   Approximately 10 to 15 times, but I don't remember the

5  exact times.

6  *Q.*   And why did you go there?

7  *A.*   To pick up marijuana.

8  *Q.*   And how much marijuana would you pick up each time you

9  went to this grow?

10  *A.*   Well, it varied each and every time, and I would say

11  average would be 150 pounds.

12  *Q.*   And did you pick up more than that ever?

13  *A.*   Yes, I must have.

14  *Q.*   What was the most amount of marijuana that you would pick

15  up from that grow?

16  *A.*   200 pounds, approximately.

17  *Q.*   And do you recall how the marijuana was packaged when you

18  picked it up from the grow?

19  *A.*   Packaged in cardboard boxes, Home Depot cardboard boxes.

20  *Q.*   And typically about how many cardboard boxes would you

21  load in your van when you went to this grow?

22  *A.*   Approximately ten boxes.

23  *Q.*   Typically about what time of day did these pickups occur

24  at this grow?

25  *A.*   Afternoons.

1   *Q.*   And do you recall about how long it would take for you to

2   pick up while you were at this grow?

3   *A.*   A little over ten minutes.

4   *Q.*   So tell the jury, what would you do when you arrived at

5   this grow?

6   *A.*   I would call them saying I arrived.  I would ask them to

7   open the door for me.

8   *Q.*   Who did you call?

9   *A.*   My boss.

10  *Q.*   What's his name?

11  *A.*   Hui.

12  *Q.*   So you would arrive and call Hui?

13  *A.*   Yes.

14  *Q.*   And then somebody would open the gate?

15  *A.*   Yes.

16  *Q.*   And then what would happen?

17  *A.*   Then my vehicle would be driven to the warehouse to load

18  the merchandise.

19  *Q.*   And would -- would anyone help you load the boxes of

20  marijuana into your van?

21          MR. BENNETT:  I object, Your Honor.

22          MR. HENRY:  If I may, I have an objection because

23  the way he just testified, it's almost like facts that aren't

24  in evidence.  It sounds like he didn't take the vehicle into

25  the warehouse.

1          THE COURT:  Well --

2          MR. HENRY:  He said someone --

3          THE COURT:  Hold on.  Let's go to the headsets.

4          THE INTERPRETER:  May the interpreter ask one

5   question?  Does the interpreter need to do simultaneous

6   interpretation for the witness when the attorneys are talking?

7          THE COURT:  For the objection?

8          THE INTERPRETER:  Yes.

9          THE COURT:  No, not at this time.

10          THE INTERPRETER:  Thank you for the clarification.

11     (The following bench conference was held outside the hearing

12   of the jury.)

13          THE COURT:  It's a lot of moving parts.

14      Mr. Henry, what was your objection?

15          MR. HENRY:  So there -- we are privy to statements

16   that Mr. Ye made in proffer sessions where he originally said

17   that he would bring the vehicle to the location, get out of the

18   vehicle, and somebody else would take the vehicle into the

19   location, load it, and bring the vehicle back.

20          THE COURT:  But that you're saying is something

21   that came from the discovery materials?

22          MR. HENRY:  Correct.  So the way he just answered

23   that last question was they would take my vehicle, then the

24   follow-up question was would somebody help you load.  He hasn't

25   laid the foundation that he went in with the vehicle to load

1   the marijuana.

2           THE COURT:  Mr. McGarry, I think that objection can

3   be resolved if you would re-ask your question with the

4   foundational --

5           MR. MCGARRY:  I agree, Your Honor.  I think he said

6   it would be driven, so it wasn't exactly clear, and I can clear

7   that up.

8           THE COURT:  I understand.  And I know that there is

9   a little bit of syntax difference with the translation.  But,

10  Mr. McGarry, I think you can address the objection.  If that

11  does not resolve it, Mr. Henry, I think you can re-raise your

12  objection.

13          MR. HENRY:  Thank you.

14          THE COURT:  Now, Mr. Gallon, I moved on from you.

15  I think you actually objected first.  Do you have a different

16  objection?

17          MR. GALLON:  Once again to leading objection, Your

18  Honor.

19          THE COURT:  Okay.  Mr. McGarry, again, I understand

20  the difficulties with the translation issues, but please be

21  mindful of leading the witness.

22          MR. MCGARRY:  Yes, Your Honor, and some of it is

23  just foundational.  We -- redirecting into new topics, which I

24  believe is appropriate.

25          THE COURT:  I understand.

1    So again, for these purposes, the objection will be

2  overruled, although I will caution counsel about leading.

3    (The following record was made in open court, in the

4  presence of all parties, counsel, and in the presence and

5  hearing of the jury.)

6         THE COURT:  You may proceed, counsel.

7  *Q.*  (BY MR. MCGARRY)  Mr. Ye, would you drive the van into the

8  property?

9  *A.*  Yes.

10 *Q.*  And once you were on the property to load boxes of

11 marijuana into the van, would anyone help you?

12 *A.*  Yes.

13 *Q.*  Do you recall how many people would help?

14 *A.*  Three or four of them.

15 *Q.*  Do you see one of the persons who would help load

16 marijuana into your van in the courtroom today?

17 *A.*  Yes.

18 *Q.*  What is he wearing?

19 *A.*  In black.

20 *Q.*  A little bit more description?

21 *A.*  I cannot really see very well from this angle.

22         THE COURT:  Mr. Ye, if you need to, you may stand

23 up.

24         THE WITNESS:  He is in a jacket.

25 *Q.*  (BY MR. MCGARRY)  If you could, just stand up.  Everybody

1    at the table up here is wearing a tie.  What color tie is the

2    person that you're talking about wearing?

3    A.    In black.

4            MR. MCGARRY:  Your Honor, I would let the record

5    reflect that the witness has identified the defendant Mr. Lin.

6            THE COURT:  Record will so reflect.

7        And I think, for clarity of the record, Mr. McGarry, I

8    will note that you had asked him to identify by tie and my, at

9    least, view of the courtroom is that he's the only individual

10   in a black tie, so.

11           MR. MCGARRY:  Yes.  Thank you, Your Honor.  That

12   was my intention.

13   Q.    (BY MR. MCGARRY)  After your arrest, were you shown --

14           MR. MCGARRY:  Let's go to Government's Exhibit 206.

15       (Exhibit published to the jury.)

16   Q.    (BY MR. MCGARRY)  After your arrest, were you shown this

17   photo in a prior meeting with the government and identified

18   this person as the person who helped load boxes of marijuana

19   into your van at the grow?

20   A.    Yes.

21   Q.    Is that the same person you just identified in the

22   courtroom?

23   A.    Yes.

24   Q.    When you were at the grow, do you recall seeing any

25   vehicles?

1    THE INTERPRETER:  Can you repeat that, please?

2  *Q.*  (BY MR. MCGARRY)  When you were at the grow, do you recall

3  seeing any vehicles?

4  *A.*  I see a Lexus -- I see a Lexus SUV there.

5  *Q.*  Now, after you picked up marijuana, you said you would

6  take it to the Linn Street house; right?

7  *A.*  That's correct.

8  *Q.*  What would you do with the marijuana there?

9  *A.*  They are temporarily stored in that house.

10  *Q.*  And would anybody help you with this?

11  *A.*  Yes.

12  *Q.*  Who was that?

13  *A.*  We called him Simon.

14  *Q.*  And after taking the marijuana to the Linn Street

15  residence, what would you do with the marijuana after that?

16  *A.*  So I would wait until Friday, then there will be a tow

17  truck, then we will load everything on a pallet into that truck

18  and the -- and the trailer.

19  *Q.*  A tow truck?  I -- there might be an interpreting problem

20  with that.

21  *A.*  Semi truck is what I meant.

22  *Q.*  Okay.  Can we look at -- so you would move the marijuana

23  from the Linn Street address and take it to a warehouse, is

24  that what you just said?

25  *A.*  Correct.

1          MR. MCGARRY:  Can we look at Government's

2    Exhibit 207?

3          (Exhibit published to the jury.)

4    Q.   (BY MR. MCGARRY)  What do we see here?

5    A.   That is the company's warehouse.

6    Q.   Is this where you would take the marijuana to after

7    storing it at the Linn Street house?

8    A.   Correct.

9    Q.   Where is that warehouse located?

10   A.   400 Hudiburg Circle, Oklahoma.

11   Q.   Is that in Oklahoma City?

12   A.   Correct.

13   Q.   And how did you transport the marijuana from that Linn

14   Street house to this warehouse?

15   A.   That I use the box truck that the company has.

16   Q.   Is the box truck shown in this photo?

17   A.   Yes.

18   Q.   We kind of zoomed in.  Right there, that truck in the far

19   right?

20   A.   Yes.

21   Q.   Did you use any other vehicles to transport the marijuana

22   from the Linn Street address to this warehouse?

23   A.   That I have used the Amazon truck or van.

24   Q.   Have you used the Arch Granite van?

25   A.   I have too.

1    *Q.*    Any other vehicles?

2    *A.*    Pickups.

3    *Q.*    Did anyone help you with this transportation, aside from

4    Simon that you mentioned earlier?

5    *A.*    Yes.

6    *Q.*    Who's that?

7    *A.*    Hui.

8              THE INTERPRETER:  H-U-I.  Interpreter spell.

9         (Reporter thanks the interpreter.)

10    *Q.*    (BY MR. MCGARRY)  Anyone else?

11    *A.*    No one.

12    *Q.*    And what happened when the marijuana got to your

13    warehouse?

14    *A.*    So if they were packed in the black bags, then we need to

15    repack them into cartons.

16    *Q.*    And after you -- you would repack them at this warehouse?

17    *A.*    No.

18              MR. HENRY:  I have an objection.  I just don't

19    think any of this is relevant.

20              THE COURT:  Overruled.

21              THE INTERPRETER:  The interpreter continue:

22              THE WITNESS:  So it was down in the house.

23    *Q.*    (BY MR. MCGARRY)  And then once you transported the

24    marijuana to this warehouse, was it loaded onto a semi?  I

25    think that's what you said; right?

1    A.    Correct.

2    Q.    Where would the semi take the marijuana?

3    A.    Well, I don't know specifically where they would go, but I

4    would think it's out of states.

5    Q.    Any idea?

6    A.    New York.

7    Q.    Anywhere else?

8    A.    I don't know.

9    Q.    How often would a semi truck transport the marijuana from

10   one of your warehouses out of state?

11   A.    Once every week.

12   Q.    And when did that start?

13   A.    In June of 2022.

14   Q.    When did that end?

15   A.    Then until that I was arrested, that very same day.

16   Q.    March 31st, 2023?

17   A.    Yes.

18   Q.    That night, were you in the process of preparing to load a

19   semi truck with marijuana to be shipped out of state?

20   A.    Yes.

21   Q.    Had marijuana just been taken to the warehouse that night?

22   A.    Correct.

23              MR. MCGARRY:  Let's look at Government's

24   Exhibit 208, please.

25          (Exhibit published to the jury.)

1  Q.  (BY MR. MCGARRY)  What do we see here?

2  A.  My pickup truck.

3  Q.  What's in the back there?

4  A.  Marijuana.

5  Q.  Inside those bags is marijuana?

6  A.  Correct.

7       MR. MCGARRY:  Let's look at Government's

8  Exhibit 209.

9       (Exhibit published to the jury.)

10  Q.  (BY MR. MCGARRY)  Is this what was inside those bags?

11  A.  Correct.

12       MR. MCGARRY:  Let's look at Government's

13  Exhibit 210.

14       (Exhibit published to the jury.)

15  Q.  (BY MR. MCGARRY)  What do we see here?

16  A.  The company's warehouse.

17  Q.  And on the left, in kind of in the bottom, those boxes, do

18  you know what's inside those?

19  A.  Marijuanas.

20  Q.  And this is all being prepared to be loaded onto a semi?

21  A.  Yes.

22  Q.  And how would the marijuana be loaded into the back of

23  the -- this semi -- a semi truck?

24  A.  We used the pallet and then used the forklift to move them

25  to the semi.

1  *Q.*   Do you recall about how many pounds of marijuana you would

2  load into the back of a semi?

3  *A.*   Approximately 2,000, 2,000 pounds.

4           MR. MCGARRY:  Let's look at Government's

5  Exhibit 211.

6       (Exhibit published to the jury.)

7  *Q.*   (BY MR. MCGARRY)  Is this the semi that you would load up

8  with marijuana?

9  *A.*   Yes.

10          MR. MCGARRY:  One moment.

11          THE INTERPRETER:  Your Honor, we're going to hand

12  over.  Thank you.

13 *Q.*   (BY MR. MCGARRY)  And you would ship the marijuana on a

14  semi every Friday?

15 *A.*   Yes.

16 *Q.*   And when you were arrested on March 31st, 2023, weren't

17  other people arrested as well?

18 *A.*   Yes.

19 *Q.*   And were they helping you?

20          THE INTERPRETER:  Interpreter request repetition,

21  please.

22 *Q.*   (BY MR. MCGARRY)  Were those people who were arrested

23  helping you that night?

24 *A.*   Yes.

25          MR. MCGARRY:  Pass the witness, Your Honor.

1        THE COURT:  Does anybody have a phone in the

2   courtroom that might be ringing?  Well, it's going to

3   voicemail, so.  As long as they're not calling back, we'll be

4   okay.

5        Cross-examination, Mr. Henry.

6        MR. HENRY:  I have no cross, Your Honor.

7        THE COURT:  Okay.  Mr. Gallon?

8        Actually, Mr. Gallon, before you start, rather than

9   interrupt you, this might be a good time for our morning break.

10  Sorry, I should have caught you before you came up.

11       But, ladies and gentlemen, we will take our morning break

12  for about 15 to 20 minutes.  The same admonition applies,

13  please don't talk about the case amongst yourselves or with

14  anybody else.

15       Please keep an open mind until you have received all the

16  evidence and deliberate.  Be sure you go straight to the jury

17  assembly room.

18       Court will remain in attendance and seated while the jury

19  departs.

20       Be sure and leave your notes in your chairs.

21       (Jury exited.)

22       THE COURT:  I would ask -- I don't know, it could

23  have been a juror's phone -- but if everybody would please, if

24  you have a phone, double check while we're on recess.

25       Anything that we need to take up before we take our break,

1    government?

2              MR. MCGARRY:  No, Your Honor.

3              THE COURT:  Mr. Henry?

4              MR. HENRY:  No, Your Honor.

5              THE COURT:  Mr. Gallon?

6              MR. GALLON:  No, Your Honor.

7              THE COURT:  Court's in recess.

8         Break taken.  Then the following record was made in open

9    court, in the presence of all parties, counsel, and in the

10   presence and hearing of the jury.)

11             THE COURT:  Mr. Gallon, you may proceed with your

12   cross-examination.

13             MR. GALLON:  Thank you, Your Honor.

14        If I could ask for Exhibit No. 211 to be shown, please.

15        (Exhibit published to the jury.)

16                    CROSS-EXAMINATION

17   BY GALLON:

18   Q.   Did Mr. Lin ever help with that semi?

19   A.   Which Mr. Lin you are referring to?

20   Q.   My client, Mr. Lin, Tong Lin.

21   A.   No.  No, he did not help me.

22   Q.   You indicated that you had met with the government on

23   several occasions.

24   A.   Yes.

25   Q.   Approximately how many times?

1    *A.*    Four times.

2    *Q.*    When you met with the government, who was present at those

3    meetings?

4    *A.*    Government lawyer and that one, that officer.

5    *Q.*    Okay.  And did you give statements to that officer?

6    *A.*    Yes.

7    *Q.*    And when did you recognize the Wetumka grow -- let me ask

8    a better question.

9                MR. GALLON:  Could you put up the picture of the

10    gate?

11        (Exhibit published to the jury.)

12    *Q.*    (BY MR. GALLON)  When did you recognize this picture?

13    *A.*    Several weeks.

14    *Q.*    Several weeks ago?

15    *A.*    Yes.

16    *Q.*    Two weeks ago?

17    *A.*    Let me think.

18    *Q.*    It's okay.

19        So you first met with the agent in March when you were

20    arrested; correct?

21    *A.*    Yes.

22    *Q.*    You gave a statement at that time to the agent?

23    *A.*    No.

24    *Q.*    Okay.  When did you give your first statement to the

25    agent?

1  *A.*  Statement?  Wait.  They first asked me some questions, but

2  they did not record the statement I made.  So several weeks

3  ago, and I did it again.

4  *Q.*  Okay.  But even though they didn't record the statement,

5  he told them -- strike that.

6      Did Mr. Ye, whenever he was speaking to the agent,

7  describe what he was doing with the Amazon truck?

8              MR. MCGARRY:  Objection; form.

9              THE INTERPRETER:  The interpreter --

10             THE COURT:  He can answer if he understands the

11  question and knows the answer.

12             THE WITNESS:  Yes.

13  *Q.*  (BY MR. GALLON)  When did he give his statement about the

14  Amazon truck?

15             THE COURT:  Mr. Gallon, maybe the confusing part is

16  you're kind of switching between first and third person here.

17  I think if you just ask your question directly to Mr. Ye and

18  then the translator -- I think you said "when did he" -- I

19  think if you rephrase it as "when did you," that will clarify

20  anything that's lost in the translation.

21      Does that address what you were talking about,

22  Mr. McGarry?

23             MR. MCGARRY:  Yeah.  It's confusing because he's

24  talking about the witness in third person.

25             THE COURT:  Am I clear?

1        MR. GALLON:  I understand, Your Honor.

2   Q.   (BY MR. GALLON)  When did you describe to the agent your

3   use of the Amazon truck?

4   A.   I really did not describe my use of Amazon truck to them,

5   but they find out themselves.  They find out I used Amazon

6   truck.

7   Q.   Did you confirm to them you were using the Amazon truck?

8   A.   Yes.

9   Q.   When did you confirm you were using the Amazon truck to

10  the agent?

11  A.   Must be the first time when we met.

12  Q.   When was the first time we met?

13  A.   One week after I was bonded out from the prison or jail.

14  Q.   So that would be in March of 2023?

15  A.   April, must be in April, approximately.

16  Q.   In April of 2023, did you tell the agent the grows that

17  you went to to pick up marijuana?

18  A.   They provided a list for me to point out which one I may

19  have been to or not.

20  Q.   Okay.  And that was the -- they gave you the list in

21  April?

22  A.   Yes.

23  Q.   And you did not point out the Wetumka grow at that time?

24  A.   Correct.

25  Q.   Then when was the next time you met with the agent after

1  April?

2  *A.*  I don't remember the exact time next time.

3  *Q.*  But you testified it was two to three times?

4  *A.*  Four times.

5  *Q.*  Four times.

6  At each of the four times that you met with the agent,

7  approximately when did that occur?  What time frame?  From

8  April to when did the four meetings happen?

9  *A.*  Since April, I would say one time every month,

10  approximately.

11  *Q.*  And approximately how long would those interrogations

12  last?

13  Let me rephrase that.

14  At the meeting, how long would the agent ask you

15  questions?

16  *A.*  Approximately two hours.

17  *Q.*  So -- strike that question.

18  At the meetings, was there always an agent and an attorney

19  there?

20  *A.*  Yes.

21  *Q.*  And was that an attorney for the government?

22  *A.*  Yes.

23  *Q.*  And did that attorney question you as well during the

24  two-hour session?

25  *A.*  Yes.

1  Q.   And I see you're currently in orange jumpsuit with a

2  handcuffs.  Are you in custody?

3  A.   Yes.

4  Q.   And you have been in custody since March 23rd; is that

5  correct?

6  A.   No.

7  Q.   No?  When did you go into custody?

8  A.   On September the 11th, after I pled guilty.

9  Q.   And from March to September the 11th, were you employed?

10 A.   Yes, with the granite company.  I moved to a new location,

11 but I was still employed.

12 Q.   Okay.  So he was employed after he was arrested until he

13 went to jail in September?

14 A.   Yes.

15 Q.   Okay.  All right.  So from September 11th until two weeks

16 ago, you were in custody; correct?

17 A.   Up to now, I'm still in custody.

18 Q.   I'm only worried from September 11th until two weeks ago.

19 A.   Yes.

20 Q.   Okay.  And so how do you spend your time in the jail?

21          MR. MCGARRY:  Objection, Your Honor.

22          THE COURT:  Basis?

23          MR. MCGARRY:  Relevance.

24          MR. GALLON:  I'm trying to lay the foundation of --

25 that -- about his memory, Your Honor.

1           THE COURT:  Overruled.

2           THE WITNESS:  You want to know how I spend my time?

3   Q.  (BY MR. GALLON)  Correct.  I would like to know how you

4   spend your time in jail.

5   A.  Read, sleep, and play cards.

6   Q.  Does he ever think about this case while he's in jail?

7   A.  No.

8   Q.  Okay.  Has he reviewed any documents in preparation --

9           THE COURT:  Counsel, remember ask your question to

10  him, not the interpreter.  So it wouldn't be "does he."  It's

11  "do you."

12          MR. GALLON:  I'm sorry.

13          THE COURT:  That's okay.

14  Q.  (BY MR. GALLON)  Have you reviewed any documents in

15  preparation of your testimony for this case?

16  A.  No.

17  Q.  Okay.  So when he met with the -- when you -- I'm sorry.

18          MR. GALLON:  I'll get it here in a minute, Your

19  Honor.

20  Q.  (BY MR. GALLON)  When you met with the agent and the

21  government attorney, did you go over documents in preparation

22  for this case?

23  A.  No.

24  Q.  All right.  In the -- when you met with the attorney and

25  the agent, you did not recognize my client, Mr. Tong Lin, until

1  two weeks ago; correct?

2  A.   I was not provided any photos for identification

3  previously.

4  Q.   Okay.  That's fine.

5       And you were shown his picture?  You were shown -- I'm

6  sorry.  You were shown Tong Lin's picture and that's how you

7  ID'd him?

8  A.   Yes.

9  Q.   Okay.  How -- how did you know to go to the grow in

10 Wetumka?

11 A.   Well, they show me the photo, yes, and I have been there,

12 and also the government attorney showed the GPS record.

13 Q.   Okay.  Who told you to go to the grow in Wetumka?

14 A.   My boss, Hui.

15 Q.   You testified here in the court today that you do not

16 think about this case; correct?

17 A.   I don't know.  What does that mean?

18 Q.   You testified while you were in jail you do not think

19 about this case?

20 A.   That's right, I do not think about this.

21 Q.   Okay.  And so, according to your testimony here today, you

22 delivered -- or you loaded a semi with 2,000 pounds of

23 marijuana each week?  I'm asking him, that's what his testimony

24 was.

25 A.   Yes, approximately.  Approximately, it's not exactly.

1    *Q.*    Approximately.  And you did that for approximately six

2    months?

3    *A.*    Seven months.

4    *Q.*    Seven months.

5         And so I'm not -- so does he know approximately --

6              THE COURT:  Counsel, it would be does -- "do you

7    know."

8    *Q.*    (BY MR. GALLON)  Do you know how many total pounds in

9    seven months was put on the semi?

10   *A.*    I don't know.  I never thought about that.

11   *Q.*    You would agree with me it would be thousands?

12   *A.*    I don't know how to answer that.

13   *Q.*    Would you agree -- or let me strike that.

14        I'm trying to think how -- 2,000 pounds -- you loaded

15   2,000 pounds in a semi every week for seven months.  It would

16   be thousands and thousands and thousands of pounds; correct?

17   *A.*    Yes.

18   *Q.*    You have pled guilty to conspiracy to distribute

19   marijuana?

20   *A.*    Conspiracy?  I did not plead to conspiracy.

21   *Q.*    What did he plead to?

22   *A.*    Possession of marijuana with intent to distribute, and --

23   and the gun.

24   *Q.*    And the gun.  Okay.  Does the amount of marijuana that you

25   distributed affect you -- how long you could go to prison?

1    A.    That must be the case, yes.

2    Q.    You could go to prison for a long, long, long time;

3    correct?

4    A.    Yes.

5    Q.    And you never think about this case?

6    A.    I already signed agreement to get zero to 20 years.

7    Q.    Okay.  So your testimony here today did affect -- it does

8    affect how long you will go to prison?

9              MR. MCGARRY:  Objection, Your Honor.  Can we go to

10    the headset on this?

11         (The following bench conference was held outside the

12    hearing of the jury.)

13              THE COURT:  What's the basis for the objection?

14              MR. MCGARRY:  I don't think he has knowledge of

15    this.  This is -- his sentence and punishment is purely within

16    the Court's purview.

17         He can't really actually testify about this.  I just don't

18    want him to confuse or mislead the jury about something that he

19    would be unable to speak on.

20              THE COURT:  Mr. Gallon, response.

21              MR. GALLON:  My whole point is, is that, you know,

22    he has no memory, all of a sudden he has a memory.  It's

23    because of his deal, Your Honor.

24              MR. MCGARRY:  I don't even see that line -- sorry,

25    Your Honor.

1          THE COURT:  Mr. Gallon, I'm not sure I understand.

2     Again, tell me -- tell me your response to the objection.

3          Mr. McGarry, can you repeat exactly the foundation -- the

4     basis for your objection?

5          MR. MCGARRY:  Yeah.  I mean, it was essentially

6     two, that being that he's about -- asking him questions of

7     which he can't have personal knowledge of because he'd be

8     testifying about what the Court -- only the Court can do.  And

9     then, B, I think it gets into confusing the jury about that if

10    he says something or misstates something when it's not going --

11    you know, something he can't even testify about.

12         You know, his punishment is decided by the Court, and that

13    alone.  And I feel like that he's asking him what kind of

14    punishment --

15         THE COURT:  Well, I'm still not certain I

16    understand exactly what the objection is, but, Mr. Gallon, do

17    you want to respond?

18         MR. GALLON:  I'm not trying to get into the exact

19    nature of the plea deal with Mr. Ye.  I'm only trying to point

20    out that he has -- had a reason to pick my client in the last

21    two weeks.

22         THE COURT:  I do think that you have covered that

23    in terms of him struggling with his memory.  I think you have

24    covered with him the distinction between what he remembered

25    earlier and what he remembers now.

1      And I do think that you have elicited from him that his

2  testimony is, while he has no guarantee, is in hopes of

3  receiving some leniency or reduced sentence.

4      So I'm not exactly sure the objection specified this, but

5  I do think it is asked and answered.  And so I'm going to

6  sustain the objection at this time.

7      (The following record was made in open court, in the

8  presence of all parties, counsel, and in the presence and

9  hearing of the jury.)

10 *Q.*  (BY MR. GALLON)  You identified my client by one picture

11 two weeks ago?

12 *A.*  Correct.

13           MR. GALLON:  I have no other questions, Your Honor.

14           THE COURT:  Redirect?

15                    REDIRECT EXAMINATION

16 BY MR. MCGARRY:

17 *Q.*  Mr. Ye, did you identify the defendant Tong Lin based on

18 the picture or because he helped load up boxes of marijuana

19 into your fake Amazon van?

20 *A.*  Because that he was helping loading.

21 *Q.*  Loading the marijuana; right?

22 *A.*  Correct.

23 *Q.*  And you -- after your arrest, you did meet with the

24 government multiple times; correct?

25 *A.*  Correct.

BRANDON YE - Redirect by Mr. McGarry

1   *Q.*   You met with us voluntarily?

2   *A.*   Correct.

3   *Q.*   Because you wanted to tell us about what you did and take

4   responsibility for your actions?

5                THE COURT:  Counsel, be mindful of leading

6   questions and testifying.  You can rephrase the question.

7   *Q.*   (BY MR. MCGARRY)  Did we want to know about the various

8   marijuana grows that you went to?

9   *A.*   Yes.

10  *Q.*   And did you drive one of your vans, typically the fake

11  Amazon van, nearly every day of the week to a marijuana grow?

12  *A.*   Yes.

13  *Q.*   Did you go to more than 20 grows -- 20 different grows

14  total?

15  *A.*   That should be the case.

16  *Q.*   So did it take multiple meetings for us to go over those

17  and talk about those various grows that you went to?

18  *A.*   Yes.

19  *Q.*   And were you originally charged with drug conspiracy?

20  *A.*   Correct.

21  *Q.*   And possession of marijuana with intent to distribute?

22  *A.*   Yes.

23  *Q.*   And possession of a firearm in furtherance of a

24  drug-trafficking crime?

25  *A.*   Correct.

Emily Cripe, CSR
United States Court Reporter
U.S. Courthouse, 200 N.W. 4th St.
Oklahoma City, OK 73102 * 405.609.5094

1    *Q.    And your plea agreement with the government was a plea to*
2    *possession with intent to distribute marijuana?*
3    *A.    Correct.*
4    *Q.    And possession of a firearm in furtherance of a*
5    *drug-trafficking crime?*
6    *A.    Correct.*
7    *Q.    And when you said you loaded thousands and thousands of*
8    *pounds of marijuana into a back of a semi, how was that done?*
9    *A.    Can you repeat your question, please?*
10   *Q.    When you loaded the marijuana into the back of a semi, did*
11   *you do it by hand?*
12   *A.    No.*
13   *Q.    How did you do it?*
14   *A.    By using the forklifts.*
15   *Q.    And you said you worked for somebody named Hui; right?*
16   *A.    Yes.*
17   *Q.    What is his full name?*
18   *A.    I don't know.*
19            MR. MCGARRY:  Nothing further, Your Honor.
20            THE COURT:  Any cross?
21            MR. HENRY:  I do have some questions.
22                    CROSS-EXAMINATION
23   BY MR. HENRY:
24   *Q.    Hi, good morning.*
25   *A.    Good morning.*

1  *Q.*   I would just ask you if you could just, when you answer,
2  please speak louder just so they can hear you back there.
3  *A.*   All right.
4  *Q.*   Thank you.
5      You just testified that you pled guilty to possession of
6  marijuana with intent to distribute and you were told that
7  carries zero to 20 years in prison; correct?
8  *A.*   Correct.
9  *Q.*   And you -- somebody informed you -- I don't want to talk
10  about what you said to your lawyer or what your lawyer said to
11  you.  But you were informed by somebody that there are
12  sentencing guidelines, and you were informed on what your
13  guidelines would be based on the amount of marijuana that you
14  pled guilty to; correct?
15  *A.*   Yes.
16  *Q.*   Again, just please be loud.
17  *A.*   Yes.
18  *Q.*   Thank you.
19      So using your numbers, you committed this crime from April
20  of 2022 until March of 2023.  So we can agree that's 11 months;
21  correct?
22  *A.*   Not exactly or correct because I didn't get the semi truck
23  until June.
24  *Q.*   Okay.  So let's -- we can move that.
25      So from June of 2022 to March of 2023 is nine months --

1  seven months; correct?  Lawyer math is dangerous.

2      So then to use your numbers, 2,000 pounds a week is

3  8,000 pounds a month for seven months would be 56,000 pounds of

4  marijuana would be the number that would be impacting your

5  sentencing guidelines for that charge of possession with intent

6  to distribute marijuana; correct?

7  A.   I don't really know.  I don't know how the calculation

8  could be.

9  Q.   Okay.  I mean, so -- well, it's 56 -- you were also

10  told -- so you get a sentence on the marijuana charge, zero to

11  20.  And you were also informed, probably by the Court you

12  plead guilty in front of, that the possession of a firearm in

13  furtherance of a drug conspiracy, that's the 924(c) charge you

14  pled guilty to, the maximum sentence for that is life in

15  prison.  You know that; correct?

16  A.   I do know that.

17  Q.   Okay.  And you also know that the sentence for the 924(c)

18  runs what they call consecutive, meaning on top of the sentence

19  for the drug crime?

20  A.   Yes.

21  Q.   And you know that that has to be a minimum of five years

22  for the 924(c); correct?

23  A.   Yes.

24  Q.   And you do know, because it was told to you by the

25  government with your guilty plea, that the only way that the

1  five years consecutive can be removed is by a motion from the

2  government; correct?

3  *A.*   That, I don't know.

4  *Q.*   So they didn't tell you, either your lawyer or the

5  government didn't tell you that when you enter into this guilty

6  plea where you got a --

7              MR. MCGARRY:  Objection; asked and answered.

8              THE COURT:  Sustained.

9  *Q.*   (BY MR. HENRY)  I'm not sure I had a question -- so you

10  don't know who can remove the five years off of your sentence;

11  correct?

12  *A.*   Correct.

13  *Q.*   You do know that the government -- well, strike that.

14      The government has told you that, at the time of your

15  sentencing, that they will ask the Court -- whichever that

16  Court is, I'm not sure who you pled guilty in front of -- to

17  reduce your sentence; correct?

18  *A.*   Yes.

19  *Q.*   Okay.  Because, I will state the obvious, but you don't

20  like being in jail; correct?

21  *A.*   Correct.

22  *Q.*   Was there ever a conversation while you were preparing for

23  this case with the government where you were told by somebody

24  from the government, doesn't necessarily have to be any of

25  these gentlemen behind me, but somebody with the government

1  that the information you were providing on this case was not

2  sufficient for them to make a recommendation to the judge to

3  lower your sentence?

4  A.  I can't understand what you're asking.

5  Q.  Okay.  You do know that in order for you to have your

6  sentence reduced the government has to be satisfied with how

7  you testified?

8          MR. MCGARRY:  Objection, Your Honor; this is asked

9  and answered.

10          THE COURT:  I don't believe this question's been

11  asked.  I mean, we have plowed some of this ground, but --

12          MR. HENRY:  That's my last question.

13          THE COURT:  I don't think this question has been

14  asked and answered.  The objection will be overruled.

15          THE INTERPRETER:  Let interpreter finish the

16  translation.

17          THE WITNESS:  I did not know that.

18          MR. HENRY:  Thank you.  I have no further

19  questions.

20          MR. GALLON:  Yes, Your Honor, just a couple.

21                  RECROSS EXAMINATION

22  BY MR. GALLON:

23  Q.  Mr. Ye, you did not remember anything about the Wetumka

24  grow up until two weeks ago?

25  A.  That is not the case, no.

1   *Q.*   Okay.  When did he remember?

2   *A.*   I know of that place all along.

3   *Q.*   But you couldn't remember until the pictures two weeks

4   ago?

5   *A.*   That's correct.

6   *Q.*   And you're here for you today, as you have testified?

7   *A.*   Definitely, yes, for myself.

8            THE COURT:  Is that all you have, Mr. Gallon?

9            MR. GALLON:  Yes, Your Honor.  I'm sorry.

10           THE COURT:  Any reason why Mr. Ye may not be

11  returned to the custody of the U.S. marshals?

12           MR. MCGARRY:  No, Your Honor.

13           MR. HENRY:  No, Your Honor.

14           MR. GALLON:  No, Your Honor.

15           THE COURT:  Thank you, marshal.

16     Government's next witness.

17           MR. NICHOLS:  Your Honor, at this time the United

18  States would call Earnest Jordan.

19           THE COURT:  Let's go to the headset, counsel.

20    (The following bench conference was held outside the hearing

21  of the jury.)

22           THE COURT:  Let me -- Mr. Nichols, is this witness

23  strictly in reference to the 404(b)?

24           MR. NICHOLS:  Yes, Your Honor.

25           THE COURT:  I'm going to hear -- I want to hear a

1    little bit of argument on that, so I'm going to go ahead and

2    excuse the jury for lunch.  And then who would be the -- who

3    would be the government's witness after?

4              MR. MCGARRY:  It would be TFO Chad Vontungeln, and

5    I would anticipate he would be our last witness.

6              THE COURT:  I'm going to go ahead and excuse the

7    jury for lunch.

8         (The following record was made in open court, in the

9    presence of all parties, counsel, and in the presence and

10   hearing of the jury.)

11             THE COURT:  Ladies and gentlemen, we're going to go

12   ahead and take our lunch break.  We can -- I'm going to handle

13   a few matters with the lawyers at this time, so we'll work

14   through lunch and be ready to go.

15        We'll take about an hour and 15, an hour and 20, that

16   should be sufficient for us to cover the matters we need.

17        Same admonition applies, please don't discuss the case

18   amongst yourself or with anybody else.

19        Keep an open mind until all of the evidence has been

20   submitted to you.

21        If you'll leave your notebooks in your chairs, you may be

22   excused to the jury assembly room until about 1:15.

23        Court will remain in attendance and seated while the jury

24   departs.

25             (Jury exited.)

1          THE COURT:  Counsel, before we take up addressing

2     the government's 404(b), the anticipated evidence, which I take

3     from Defendant Lin's response, which is Document 84, that they

4     are going to -- they have made an objection to that evidence,

5     before we take that up, do you-all need a quick restroom break

6     or anything?  I'm happy to take a short break.

7          MR. NICHOLS:  Judge, I think I can save the Court

8     some time.  I have just -- the 404(b) evidence is a very

9     particular use towards Mr. Lin.

10         After discussing it with Mr. McGarry and also our agent, I

11    think we're going to withdraw our calling of Officer Jordan.

12    So that should make it a moot point.

13         THE COURT:  So you're withdrawing the 404(b)

14    notice?

15         MR. NICHOLS:  Yes.  And that would leave our next

16    witness being Agent Vontungeln after the lunch break.

17         THE COURT:  Okay.  Well, that makes it very easy.

18    Your lunch break just got longer.

19         MR. NICHOLS:  Apologies.

20         THE COURT:  No, that's okay.

21         No, keep your seats.

22         What -- I am going to ask that if you-all want to take --

23    let's do this.  While we're -- I think -- I mean, it looks to

24    me like that we will conclude evidence today, if there's no

25    change from defense counsel about -- I think that it looks like

1    we'll probably instruct and close after TFO Vontungeln.

2          So I would like to go ahead and we'll do the jury

3    instruction conference now.  If you guys need to use -- have a

4    little quick break before you go back, but I don't think -- I

5    don't anticipate jury instruction conference is going to take

6    very long, and then you-all can have a little short lunch break

7    after that.

8          We will finish with the witnesses.  We'll probably take a

9    break, make any record, if we need to make any record, on the

10   jury instructions, whether or not any of their -- if there's

11   any defense motions at the conclusion of the government's case,

12   and then we'll instruct and close.

13         Be thinking about -- also, I know I didn't make any final

14   decision at the pretrial.  The kind of guidance for a number of

15   minutes per trial day is out the window.  I mean, I'm not going

16   to limit you to five minutes or ten minutes for closing, but

17   think about a reasonable request for length of closing.  Again,

18   focus on what you need, not what you want.  Those are two

19   different things.

20         But anyway, does the government -- you-all have the

21   physical evidence secured, don't you?

22              MR. MCGARRY:  Yes, Your Honor.  It's here at the

23   table with us.

24              THE COURT:  Anything else before we recess for

25   lunch and the jury instruction conference?

1           MR. MCGARRY:  No, Your Honor.

2           MR. HENRY:  No, Your Honor.

3           MR. GALLON:  No, Your Honor.

4           THE COURT:  Court's in recess.

5      (Lunch break taken.)

6           THE COURT:  Government, you may call your next

7   witness.

8           MR. MCGARRY:  The United States calls FBI TFO Chad

9   Vontungeln.

10     (WITNESS SWORN.)

11          THE COURT:  You may proceed, counsel.

12                     CHAD VONTUNGELN

13                    DIRECT EXAMINATION

14  BY MCGARRY:

15  Q.   Please state your name.

16  A.   I'm Chad Vontungeln.

17  Q.   What's your job?

18  A.   I'm a task force officer for the FBI in Oklahoma.

19  Q.   How long have you done that?

20  A.   Been a task force officer for three years now.

21  Q.   What are your duties and responsibilities as a task force

22  officer for the FBI?

23  A.   I'm assigned to a unit that investigates large-scale

24  marijuana drug-trafficking organizations and criminal

25  enterprises.

1  *Q.*   And have you done that for the entirety of your three

2  years being there?

3  *A.*   Yes, I have.

4  *Q.*   What did you do prior to being a task force officer with

5  the FBI?

6  *A.*   So as a task force officer, I'm actually employed by the

7  Oklahoma City Police Department.  I'm essentially on loan to

8  the FBI by them.

9       I have been employed as an Oklahoma City police officer

10  for almost 23 years now.  My last -- in 2013, I got assigned to

11  a street narcotics unit, and I did that up until becoming a TFO

12  for the FBI three years ago.

13  *Q.*   And what kind of cases did you work when you were -- with

14  your time with the Oklahoma City Police Department?

15  *A.*   Since 2013, the street narcotics is basically like

16  lower-level, street-level narcotics, drugs involved of all

17  kind.  Before that, from 2001 to 2000, about '4, I worked

18  patrol.  Then I did a year in a street narcotics unit then, and

19  then I went back to the streets until 2013, assigned to the

20  patrol division.

21           THE COURT:  Sir, can I get you to slow down just a

22  little bit?

23           THE WITNESS:  Yes, sir.  I felt her glaring at me.

24  *Q.*   (BY MR. MCGARRY)  So have you investigated cases involving

25  firearms?

1   *A.*   Yes, sir.

2   *Q.*   And you mentioned drugs; right?

3   *A.*   Yes, sir.

4   *Q.*   What type of drug cases have you investigated?

5   *A.*   Meth, marijuana, ecstasy, heroin, fentanyl, cocaine.

6   *Q.*   So as part -- I'm sorry.

7   *A.*   Cocaine.

8   *Q.*   As part of your experience, have you investigated

9   marijuana-trafficking cases?

10  *A.*   Yes, sir.

11  *Q.*   And how long have you done that?

12  *A.*   The entire time I have been in narcotics.

13  *Q.*   And are you doing that -- have you been doing that as a

14  TFO for the FBI?

15  *A.*   Yes, sir.

16  *Q.*   Is that your primary assignment or responsibility?

17  *A.*   It has been since I came over, yes, sir.

18  *Q.*   How many marijuana-trafficking cases have you investigated

19  as a TFO?

20  *A.*   Several.  I mean, we have taken some pretty large scale,

21  and then you'll take offshoots from them.  So I would say 10 to

22  15, conservatively.  But in our enterprise, you try to go as

23  high as you can, so they're not as quick -- quick executed

24  cases.

25  *Q.*   And when you investigate these cases, are you

1    investigating drug organizations?

2    *A.*    Yes, sir.

3    *Q.*    And during your time period as a -- the time period that

4    you have been a TFO with the FBI, have you become familiar with

5    how DTOs work?

6    *A.*    Yes, sir.

7    *Q.*    During your time as a police officer, did you also gain

8    experience investigating drug-trafficking organizations as

9    well?

10   *A.*    Yes, sir.

11   *Q.*    And during that time and during your investigations of

12   investigating marijuana-trafficking cases, have you become

13   familiar with the street value and prices of marijuana?

14   *A.*    Yes, sir.

15   *Q.*    How did you do that?

16   *A.*    Usually it's done -- at this level, it's done through

17   conversations with either people that are arrested or law

18   enforcement individuals on the -- on the receiving end of the

19   marijuana in surrounding states all over.

20          You just -- you ask them kind of what's the price per

21   pound right now in your area.

22   *Q.*    And over the course of your investigations over these past

23   three years, have you become familiar with -- have those prices

24   shifted or changed?

25   *A.*    They fluctuate fairly regularly.

1  *Q.*  And do you know why that is?

2  *A.*  I think it's based on the demand at the time from the

3  organization.  I know it's also dependent on specific strains

4  of marijuana, certain qualities are higher than the others.

5  *Q.*  You're one of the agents who investigated Mr. Ye; right?

6  *A.*  Yes, sir.

7  *Q.*  And the defendants here?

8  *A.*  Yes, sir.

9  *Q.*  And in the time period of your investigation in this case,

10  what has been the price per pound of marijuana that you have

11  seen?

12  *A.*  It has averaged from $1,500 a pound to $5,000 a pound.

13  *Q.*  And in the time period, say, between December of 2022 to

14  May 17th of 2023, is that the same or what -- what's the price

15  that you have seen in that time period?

16  *A.*  It -- that is the same.  The average, I would say, is 17

17  to 2,000, a pretty consistent average.

18  *Q.*  That's marijuana per pound?

19  *A.*  Yes, sir.

20  *Q.*  And in this time period, have you investigated marijuana

21  grows?

22  *A.*  Yes, sir.

23  *Q.*  And have you become familiar with how much marijuana, like

24  one marijuana plant can produce?

25  *A.*  Yes, sir.

1  Q.   And what is that?

2  A.   There's actually a DEA standard on that.  It is -- one

3  plant is believed to count as being one pound of processed

4  marijuana.

5  Q.   And you said that you were one of the agents who have

6  investigated Mr. Weng and Tong Lin; right?

7  A.   Yes, sir.

8  Q.   What led you to investigate Mr. Weng and Mr. Lin?

9  A.   We were investigating Brandon Ye initially, and

10  surveillance observed his fake Amazon truck go to the grow

11  located in Wetumka.

12  Q.   And when did you first become aware of Mr. Ye?

13  A.   In December of 2022.

14  Q.   And so tell us how that started.

15  A.   We were conducting surveillance on a stash location of a

16  separate case when we observed a fake Amazon truck back up to

17  the garage of that stash house.  The driver got out.  The

18  garage door of the stash house opened.  They opened the back

19  doors of the fake Amazon truck, individuals came out of the

20  house, grabbed several full black trash bags out of the back of

21  the Amazon truck and took them into the garage of the house.

22  Q.   What did you believe was inside those black trash bags?

23  A.   Marijuana.

24  Q.   And were you able to confirm this throughout your

25  investigation?

1  A.   Yes, sir.

2  Q.   And was it marijuana?

3  A.   Yes, sir.

4  Q.   And how long did you investigate Mr. Ye after that?

5  A.   Until we arrested him on March 31st, 2023.

6  Q.   And what was he doing when he was arrested?

7  A.   He was supplying bulk marijuana to a warehouse that he

8  owned to be loaded on a semi to be shipped somewhere out of the

9  state of Oklahoma.

10 Q.   And during your investigation of Mr. Ye -- or that night,

11 were you present when he was arrested?

12 A.   Yes, sir.

13 Q.   And do you recall, when he was arrested, about how much

14 marijuana was recovered?

15 A.   At the warehouse, there was a little over 2,000 pounds of

16 processed and packaged marijuana recovered.

17 Q.   And was there any other marijuana recovered as a result of

18 that investigation that evening?

19 A.   Yes.  There was, I believe, a little over a hundred pounds

20 in the back of his pickup truck that was also at the warehouse.

21 And then the -- there was a house at 10720 South Linn that was

22 used as a stash location and there was a little over

23 2,000 pounds of processed and packaged recovered -- processed

24 and packaged marijuana recovered there.

25 Q.   That same evening?

1   *A.*   Yes, sir.

2   *Q.*   And during your investigation of Mr. Ye, did you conduct

3   surveillance of his activity?

4   *A.*   Yes, sir.

5   *Q.*   And what did you personally observe him to do?

6   *A.*   Mr. Ye would leave his residence off of Northwest 12th

7   Street in the morning.  He would then drive to various grows

8   nearly every day.  He would always end up either at the South

9   Linn house or back at his house, usually before he would drive

10  to grows in another part of the state.

11  *Q.*   And where was his residence?

12  *A.*   4604 Northwest 12th in Oklahoma City.

13  *Q.*   Is that in the Western District of Oklahoma?

14  *A.*   Yes, sir.

15  *Q.*   And when you observed him to go to these grows, how would

16  he typically do that?

17  *A.*   He would drive his fake Amazon truck.

18          MR. MCGARRY:  Let's look at Government's

19  Exhibit 201.

20  *Q.*   (BY MR. MCGARRY)  What do we see here?

21  *A.*   That is Brandon Ye's fake Amazon truck.

22  *Q.*   And you keep saying "fake."  Did you, during your

23  investigation, determine it to be a fake Amazon delivery van?

24  *A.*   Yes, sir.  When we originally saw it, we -- surveillance

25  got the license plate and found that it was registered to

1  Brandon Ye.

2       Amazon trucks aren't registered to their individual

3  drivers.  I think marijuana is one of the few things that

4  Amazon doesn't deliver.

5  Q.   And did you see him utilize more than one van in

6  furtherance of his drug trafficking?

7  A.   Yes, sir, I did.

8  Q.   What other van did you observe him to use?

9  A.   He used his Arch Granite white Sprinter van.  I believe it

10 was a Freightliner van, but it was the Arch Granite white

11 Sprinter van.

12            MR. MCGARRY:  Can we look at Government's

13 Exhibit 200, please?

14 Q.   (BY MR. MCGARRY)  Is that the van?

15 A.   Yes, sir.

16 Q.   And did he use that van in the same manner?

17 A.   Yes, sir.

18 Q.   And as part of your surveillance of Mr. Ye's activity, did

19 you install a global positioning system or GPS tracker on his

20 fake Amazon van?

21 A.   Yes, sir.

22 Q.   And when did you do that?

23 A.   Late December of 2022, I believe.

24 Q.   And what company did you use for the tracker?

25 A.   We used TactiTrack.

1            MR. MCGARRY:  Let's look at Government's

2   Exhibit 212.

3   *Q.*   (BY MR. MCGARRY)  What do we see here?

4   *A.*   That is the certificate of authenticity for TactiTrack.

5   *Q.*   So is this just a certificate from the company who

6   provided the GPS and all the data from that GPS tracker?

7   *A.*   Yes, sir.

8   *Q.*   And what does -- what does the GPS tracker tracking device

9   do?

10  *A.*   It lets you know the location of the device itself.

11  There's a capability of setting the intervals at which it

12  updates.  There's a log-in to a web-based interface where you

13  can -- you can track it on the map.

14  *Q.*   So you installed this GPS tracker on Mr. Ye's fake Amazon

15  van?

16  *A.*   Yes, sir.

17  *Q.*   Tell us, when did you do that?

18  *A.*   I did that late at night while it was backed in his

19  driveway.  I climbed underneath it.  It's a magnet that

20  attaches to a metal part of the vehicle, so I put it underneath

21  the vehicle.

22  *Q.*   And just stuck it on there?

23  *A.*   Climbed underneath the vehicle and stick it to something

24  metal.

25  *Q.*   Okay.  And what kind of information does the GPS tracker

1  provide to you?

2  *A.*   It gives you the location of the tracker, whether it's

3  moving or not, and the speed at which it's moving, as well as,

4  you know, battery life, the interval duration.

5  *Q.*   How does it provide that information to you?

6  *A.*   There's a mobile app as well as a website.

7  *Q.*   How often can it provide that information?

8  *A.*   You set that interval.  Sometimes you set it for longer to

9  preserve battery life, but you can set it from, I believe it's

10 five seconds to over an hour.

11 *Q.*   So when you say that, what do you mean it's providing

12 information every five seconds?

13 *A.*   When it's moving, it will -- it will essentially ping or

14 show you an updated location every five seconds, whatever

15 interval you have set.

16 *Q.*   And then that information, you can check the location of

17 the GPS device?

18 *A.*   Yes, sir.  You can watch it nearly real time.

19 *Q.*   I was going to ask, is it provided in real time?

20 *A.*   Yes, sir.

21 *Q.*   And did you do that during your investigation?

22 *A.*   Yes, sir.

23 *Q.*   And is there a way also to check the historical or past

24 data that this GPS tracker has provided?

25 *A.*   Yes, sir.

1   Q.   How does that work?

2   A.   There's a tab on the website for historical.  You click on

3   that and then you enter your date range and the specific

4   tracker, whatever number it is assigned.

5   Q.   And does it provide hyperlinks so you can check the

6   data -- the accuracy of the data that is being provided?

7   A.   Yes.  On the -- on part of it, you can click on it and it

8   will give you Google Street View most of the time.

9   Q.   Did the GPS tracker indicate that Mr. Ye traveled to the

10  marijuana farm located at 7828 State Highway 9 in Wetumka,

11  Oklahoma?

12  A.   Yes, sir.

13            MR. MCGARRY:  Let's look at Government's

14  Exhibit 213.

15  Q.   (BY MR. MCGARRY)  You have got a book in front of you too.

16  A.   I got this.

17  Q.   And what are we looking at here?

18  A.   This is the historical printout from TactiTrack.

19  Q.   And so this is the -- is this the GPS data that's being

20  provided to you?

21  A.   Yes, sir.

22  Q.   This is the historical or past data?

23  A.   Yes, sir.

24  Q.   Okay.  Let's look at Page 1 at the bottom where there are

25  multiple entries showing Northwest 12th Street.

1    *A.*    Yes, sir.

2    *Q.*    TFO Vontungeln, what are we -- what is this showing?

3    *A.*    That is showing Brandon Ye's address.

4    *Q.*    And what is the date?

5    *A.*    January 3rd, 2023.

6    *Q.*    So what does this mean?  Does this mean the GPS tracker is

7    at Brandon Ye's residence?

8    *A.*    It does.  On January 3rd, this one shows that at 7:05 it

9    was a stop.  So this is -- this essentially is the overnight

10   from January 3rd into January 4th, if that makes sense.

11   *Q.*    And looking at these entries, what's the red and green

12   highlights?  What does that indicate?

13   *A.*    Red indicates a stoppage of movement.  I would assume

14   that's for one or more intervals, it just lets you know that

15   the GPS is stopped.

16        I believe this company's GPS specifically goes into, like,

17   a sleep or power saving mode at that point.

18   *Q.*    So just to explain for the jury what's going on here based

19   on the GPS data?

20   *A.*    At 7:05 p.m. on January 3rd, 2023, it arrived at Northwest

21   12th Street.  It then appears to have stayed there until

22   7:24 in the morning on January 4th.

23            MR. MCGARRY:  Let's take a quick look at

24   Government's Exhibit 200.

25   *Q.*    (BY MR. MCGARRY)  Is this -- what are we looking at here?

1   *A.*   That's Mr. Ye's residence.

2   *Q.*   Is that in the Western District of Oklahoma?

3   *A.*   Yes, sir.

4   *Q.*   And is this residence what's reflected in the GPS data we

5   were just looking at?

6   *A.*   Yes, sir.

7           MR. MCGARRY:  Let's go back to, 213 please, at the

8   bottom.

9   *Q.*   Based on the data from the GPS tracker, on January 4th,

10  2023, what does Mr. Ye do?

11  *A.*   He appears to leave at 7:24 in the morning.

12  *Q.*   And where does he leave from?

13  *A.*   His residence at 4608 -- 4604 Northwest 12th.

14  *Q.*   Let's take a look at Page 2 where the Hudiburg Circle

15  address is shown.  Where does this show Mr. Ye traveled to?

16  *A.*   He travels to his -- his warehouse or his granite

17  business, the location where they would load up the semi with

18  the marijuana.

19  *Q.*   Is that Hudiburg Circle address, is that the address of

20  that warehouse?

21  *A.*   Yes, sir.

22          MR. MCGARRY:  Let's look at Government's

23  Exhibit 200 -- I'm sorry, 207.

24  *Q.*   (BY MR. MCGARRY)  So is that -- what are we looking at

25  here?

1   *A.*   That is the business located at 400 Hudiburg Circle.

2   That's the Arch Granite and Cabinetry that is owned by Brandon

3   Ye.

4   *Q.*   And is that what we just looked at in the GPS tracker

5   data?

6   *A.*   Yes, sir.

7          MR. MCGARRY:  So let's go back to 213 at Page 2

8   that we were just looking at.

9   *Q.*   (BY MR. MCGARRY)  TFO Vontungeln, when did Mr. Ye go there

10  on January 4th?

11  *A.*   He arrived at 7:31 and he appears to have left at

12  7:45 a.m.

13         MR. MCGARRY:  Let's turn to Page 15.  Let's zoom in

14  on the information regarding the Hughes County data.

15  *Q.*   (BY MR. MCGARRY)  TFO Vontungeln, what do we see here?

16  *A.*   The GPS tracker that was placed on the fake Amazon truck

17  appears to have arrived at the Hughes County grow at 6 o'clock

18  p.m.

19  *Q.*   When you say "Hughes County grow," what are you talking

20  about?

21  *A.*   The Wetumka grow.

22  *Q.*   Is that the same place?

23  *A.*   Yes, sir.

24  *Q.*   And how do you know he went to that marijuana farm?

25  *A.*   If you'll click on the street views, it will show the --

1  an overhead map of the location where it's at.

2  *Q.*   So when we're looking at this on the far right, those

3  hyperlinks right there, does that take you to a -- a Google

4  image --

5  *A.*   Yes, sir.

6  *Q.*   -- of where that data is?

7  *A.*   Yes, sir.

8          MR. MCGARRY:  And let's look at Government's

9  Exhibit 205.

10 *Q.*   (BY MR. MCGARRY)  So when you click on the hyperlink on

11 the right for that data, is this the Google image that's

12 produced?

13 *A.*   Yes, sir.

14 *Q.*   And did you do this to confirm that the GPS tracker on

15 Mr. Ye's fake Amazon van went to the Wetumka grow?

16 *A.*   Yes, sir.

17 *Q.*   And when you click that hyperlink, it produces this image;

18 right?

19 *A.*   Yes, sir.

20 *Q.*   Can it also produce other images?

21 *A.*   Yes, sir.  I believe it's been updated between now and

22 then to reflect the actual buildings.  In this one you can see

23 the land's cleared out.  It appears to be building equipment,

24 but the other one has building warehouses on it.

25          MR. MCGARRY:  Let's look at Government's

1    Exhibit 204.

2    *Q.   (BY MR. MCGARRY)   What do we see here?*

3    *A.   This is street view of the entry of the Wetumka grow.*

4    *Q.   This is the street view of an image that's produced by*

5    clicking on that hyperlink on the data?

6    *A.   When you go to street view, yes, sir.*

7    *Q.   So is this an image that's produced, when you click on the*

8    link on the right, when Mr. Ye's vehicle comes to a stop on

9    January 4th, 2023, on that Hughes County data?

10   *A.   Yes, sir.*

11           MR. MCGARRY:  Let's go back to Page 15 of

12   Exhibit 213, please.

13   *Q.   (BY MR. MCGARRY)   So does this show that Mr. Ye's fake*

14   Amazon van is at that marijuana grow?

15   *A.   Yes, sir.*

16   *Q.   How long does it appear that Mr. Ye was at that marijuana*

17   farm?

18   *A.   It appears that he was there for four minutes.*

19           MR. MCGARRY:  And let's turn to the bottom of

20   Page 17.  Let's highlight the bottom entries there.

21   *Q.   (BY MR. MCGARRY)   According to the GPS data, where did*

22   Mr. Ye go after leaving the Wetumka marijuana farm?

23   *A.   He went to the 10700 block of South Linn.  That would be*

24   the Linn stash house.

25   *Q.   And where is that located?*

1   A.   In Oklahoma City, Oklahoma.

2   Q.   Is that in the Western District of Oklahoma?

3   A.   Yes, sir.

4            MR. MCGARRY:  Let's look at Government's

5   Exhibit 202.

6   Q.   (BY MR. MCGARRY)  What do we see here?

7   A.   This is the address of 10720 South Linn, that stash house

8   we spoke of earlier.

9   Q.   So is that the residence that corresponds with the GPS

10  data?

11  A.   Yes, sir.

12           MR. MCGARRY:  Let's turn to Page 19 of Government's

13  Exhibit 213, the Northwest 12th entry.

14  Q.   (BY MR. MCGARRY)  What do we see here?

15  A.   This is a -- appears to be overnight of January 12th to

16  morning of January 13th, 2023.

17  Q.   And what's the location?

18  A.   46 -- it will be 4604 Northwest 12th Street.

19  Q.   What's that?

20  A.   That is Brandon Ye's residence.

21  Q.   And looking at this GPS data, when did he leave his

22  residence?

23  A.   He left on January 13th, 2023, at 7:38 in the morning.

24  Q.   So now we're at January 13th?

25  A.   Yes, sir.

1  *Q.*   On this date, did the GPS tracker show him to travel to

2  the Wetumka marijuana farm?

3  *A.*   I believe so, yes.

4         MR. MCGARRY:  Let's turn to Page 27 with the Hughes

5  County entries.

6  *Q.*   (BY MR. MCGARRY)  What do we see here?

7  *A.*   It appears that the tracker placed on the fake Amazon

8  truck arrived at the Wetumka grow at 2:37 p.m.

9  *Q.*   How long did it appear that he stayed?

10  *A.*   Until 2:45.

11  *Q.*   About how long is that?

12  *A.*   15 minutes-ish.

13         MR. MCGARRY:  Let's turn to Page 29, the Linn

14  Street entry.

15  *Q.*   (BY MR. MCGARRY)  So where did Mr. Ye go after stopping at

16  the Wetumka grow?

17  *A.*   At 4:35 p.m. on January 13th, 2023, he arrived at that Lin

18  stash house in Oklahoma City.

19         MR. MCGARRY:  And then let's turn to Page 35, at

20  the middle entry showing Hudiburg Circle.

21  *Q.*   (BY MR. MCGARRY)  What dates do we see there?

22  *A.*   January 26th, 2023.

23  *Q.*   So what do we see here?

24  *A.*   The fake Amazon truck arrived at the 400 Hudiburg Circle

25  warehouse where they loaded marijuana onto a semi at 9:21 p.m.

1           MR. MCGARRY:  At the bottom of Page 35, let's go
2    down there.
3    Q.   (BY MR. MCGARRY)  What do we see here?
4    A.   On January 26th, 2023, at 10:56 p.m., the Amazon truck
5    arrived back at Brandon Ye's residence on Northwest 12th.
6    Q.   And then what -- below that, does it go over to the next
7    date or anything?
8    A.   Yes, it goes over to January 27th of 2023.  It appears
9    that he left at 8:35 a.m.
10   Q.   And this is January 27th of 2024 -- or 2023?
11   A.   2023.
12           MR. MCGARRY:  And let's turn to Page 73, the Hughes
13   County entries.
14   Q.   (BY MR. MCGARRY)  What do we see here?
15   A.   On January 27, 2023, at 6:14 p.m., the Amazon truck
16   arrived at the Wetumka grow.
17   Q.   What time did you say?
18   A.   6:14 p.m.
19   Q.   And how long does it appear that he stayed?
20   A.   Right at about two minutes.  Looks like he left at
21   6:18 p.m.
22           MR. MCGARRY:  Turn to Page 89, the Hudiburg
23   entries.
24   Q.   (BY MR. MCGARRY)  What do we see here?
25   A.   On January 27th, 2023, at 8:27 p.m., the fake Amazon truck

1    arrived at the warehouse on Hudiburg Circle.

2    *Q.*    So this is the same day that you just testified about the

3    Amazon van going to the Wetumka grow?

4    *A.*    Yes, sir.

5    *Q.*    Do you know whether that January 27th was a Friday?

6    *A.*    I believe that was a Friday.

7    *Q.*    Why is that important?

8    *A.*    That's the day the semis would be loaded up and transport

9    marijuana out of the state.

10   *Q.*    So according to the GPS data, after going to the Wetumka

11   grow, Mr. Ye ended up going to that warehouse?

12   *A.*    Yes, sir.

13          MR. MCGARRY:  Now, let's turn to Page 91, the

14   northwest entries.

15   *Q.*    (BY MR. MCGARRY)  What do we see here?

16   *A.*    On January 28th, 2023, at 10:29 a.m., he was at the -- his

17   address on Northwest 12th.

18   *Q.*    Is there any entries shown here of him leaving that

19   address in a date that corresponds?

20   *A.*    Yeah.  January 31st -- looks like maybe he took a day off,

21   because January 31st, 2023, he left at 8:59 a.m.

22   *Q.*    And let's turn to Page 99, the Hughes County entries.

23   What do we see there?

24   *A.*    On January 31st, 2023, at 3:19 p.m., the fake Amazon truck

25   arrived at the Wetumka grow.

1  *Q.*  That's the same day that we were just talking about when

2  he left his house?

3  *A.*  Yes, sir.

4  *Q.*  And did you say what time he arrived at the Wetumka grow?

5  *A.*  Yeah, 3:19 p.m.

6  *Q.*  How long did he stay?

7  *A.*  Until 3:37.  So, again, another 15-ish minutes.

8          MR. MCGARRY:  Let's turn to Page 101.  Looking at

9  the South Linn entries.

10  *Q.*  (BY MR. MCGARRY)  Where does this show he went after

11  leaving the grow?

12  *A.*  On January 31st, 2023, at 5:06 p.m., the Amazon truck --

13  the fake Amazon truck arrived at the South Linn stash house.

14  *Q.*  Was there anything substantially different about this trip

15  as compared to the other trips that we have talked about?

16  *A.*  No, sir.

17  *Q.*  So was his travel consistent with the prior trips you have

18  discussed?

19  *A.*  Yes, sir.

20  *Q.*  So in January of 2023, how many trips did Mr. Ye make to

21  7828 State Highway 9 in Wetumka, Oklahoma, in the fake Amazon

22  van?

23  *A.*  In the fake Amazon van, he made four trips.

24  *Q.*  And each time he left from Oklahoma City?

25  *A.*  Yes, sir.

1   Q.   In the Western District of Oklahoma?

2   A.   Yes, sir.

3   Q.   And each time, did he return to Oklahoma City?

4   A.   Yes, sir.

5   Q.   Was that every week of January 2023 except one, if you

6   know?

7   A.   I believe so, sir.  Yes, sir.

8   Q.   Would you say that's a consistent pattern of activity?

9   A.   Yes, sir.

10           MR. MCGARRY:  Let's turn to Page 104, the northwest

11  entries.

12  Q.   (BY MR. MCGARRY)  What is the date that we are looking at

13  here?

14  A.   March 10, 2023.

15  Q.   Does that go over into the next date?

16  A.   It goes into March 11, 2023.  So that would be overnight

17  between the 10th and the 11th.

18  Q.   So on the 11th, where did he start from?

19  A.   His address on Northwest 12th.

20           MR. MCGARRY:  And let's turn to Page 107, at the

21  top -- I'm sorry.  Page 107, the Hughes County.

22  Q.   (BY MR. MCGARRY)  What do we see here?

23  A.   The fake Amazon truck arrived at the Wetumka grow

24  March 11th, 2023, at 11:58 a.m.

25  Q.   How long did he stay?

1  *A.*   Until 12:06 p.m., so less than ten minutes.

2          MR. MCGARRY:  Let's turn to Page 109, the Hudiburg

3  entries.

4  *Q.*   (BY MR. MCGARRY)  Where did he go after he left the

5  marijuana grow?

6  *A.*   On March 11th, 2023, at 1:33 p.m. he arrived at the

7  Hudiburg Circle warehouse.

8          MR. MCGARRY:  Let's turn to Page 114, the Northwest

9  12th entries, please.

10  *Q.*   (BY MR. MCGARRY)  What's the date there?

11  *A.*   This appears to be overnight from March 16th into

12  March 17th, 2023.

13  *Q.*   So when did he start his day on March 17th of 2023?

14  *A.*   Looks like 4:12 in the morning.

15  *Q.*   And do you recall whether March 17th of 2023 was a Friday?

16  *A.*   Yes, I believe it was.

17          MR. MCGARRY:  Let's turn to Page 124.

18          THE WITNESS:  In fact, I know it was.

19  *Q.*   (BY MR. MCGARRY)  The Hughes County entries, what do we

20  see here?

21  *A.*   This is the fake Amazon truck arriving at the Wetumka grow

22  March 17th, 2023, at 11:42 a.m.

23  *Q.*   How long did he stay?

24  *A.*   Until 12:06.  So close to 20 minutes, 15 minutes.

25          MR. MCGARRY:  Let's turn to Page 131, the Hudiburg

1    entries.

2    *Q.*    (BY MR. MCGARRY)   Where did he go after he left the

3    Wetumka marijuana grow?

4    *A.*    On March 17, 2023, at 5:57 p.m., he arrived at the

5    Hudiburg Circle warehouse.

6    *Q.*    And is that the last trip documented by the GPS tracker?

7    *A.*    Yes, sir.

8    *Q.*    During your -- well, one second.

9                MR. MCGARRY:  Pass the witness, Your Honor.

10               THE COURT:  Cross-examination?

11               MR. HENRY:  Thank you.

12        Thank you.  I have no questions.

13               THE COURT:  Thank you.

14        Mr. Gallon or Mr. Bennett, cross-examination?

15                       CROSS-EXAMINATION

16   BY BENNETT:

17   *Q.*    Agent, you were talking about all of this GPS data.

18   *A.*    Yes, sir.

19   *Q.*    And these trips you're saying that were made to the

20   Wetumka grow; correct?

21   *A.*    Wetumka, yes, sir.

22   *Q.*    Wetumka?

23   *A.*    Yes, sir.

24   *Q.*    Were -- on these dates that you're discussing, were you

25   able to conduct any surveillance or anything?

1    *A.*   We did when he came back into the city.  We didn't always

2    follow him out because he was gone all day.  But, yeah, when he

3    would -- more often than not, by the time he got back in the

4    city, we would.

5         Plus we had pole cameras on his residence, the South Linn

6    residence, and the Hudiburg Drive warehouse as well, as well as

7    another warehouse.  So we could watch it realtime when he

8    arrived back.

9    *Q.*   And let me ask a better question, that way it will be a

10   little more clear.

11   *A.*   Okay.

12   *Q.*   Were you able to conduct any surveillance of the Wetumka

13   location during these trips?

14   *A.*   When he was out there, I did not.

15   *Q.*   Okay.  So this data, you could not place Tong Lin there at

16   that location on these dates.  Is that fair to say?

17   *A.*   Fair to say, yes, sir.

18   *Q.*   Okay.

19              MR. BENNETT:  Nothing further, Your Honor.

20              THE COURT:  Any redirect?

21              MR. MCGARRY:  No questions, Your Honor.

22              THE COURT:  Any reason why this officer may not be

23   excused?

24              MR. MCGARRY:  No, Your Honor.

25              MR. HENRY:  No, Your Honor.

1          MR. BENNETT:  No, Your Honor.

2          THE COURT:  Thank you, sir.  You may step down.

3          THE WITNESS:  Thank you, sir.

4          THE COURT:  Government's next witness.

5          MR. MCGARRY:  Your Honor, the United States rests

6   at this time.

7          THE COURT:  Okay.  Thank you.

8      Ladies and gentlemen, with that announcement, we'll have a

9   few legal matters to handle.  And so we will take a, hopefully,

10  short break.

11     I will excuse you all.  Again, keep in mind, with the case

12  not being submitted to you for your deliberations, please don't

13  talk about it amongst each other or with anybody else.  And if

14  you can leave your notebooks in your chair, you'll be excused

15  to the jury assembly room until we call back for you.

16     Court will remain in attendance and seated while the jury

17  departs.

18     (Jury exited.)

19          THE COURT:  Let me ask, counsel, now that the

20  government has rested, are there any motions on behalf of

21  defendant Jeff Weng, Mr. Henry?

22          MR. HENRY:  No, Your Honor, there are not.

23          THE COURT:  Same question, Mr. Gallon and

24  Mr. Bennett.  Any motions on behalf of Mr. Tong Lin?

25          MR. GALLON:  No, Your Honor.

1          THE COURT:  Seeing none.

2      Let me ask, Mr. Henry, does the -- does your client -- do

3  you intend to put on any case at this time?

4          MR. HENRY:  Your Honor, we have no witnesses to

5  call.  And I have discussed whether or not Mr. Weng would

6  testify, he has informed he does not want to testify.

7          THE COURT:  Okay.  Let me flesh that out just a

8  little bit more, counsel, if I can, for the record.

9      You have now advised the Court that your client has

10 voluntarily chosen not to testify in his own defense.  Have you

11 had ample time to discuss with him his right to testify, as

12 well as his right to remain silent, as well as any potential

13 advantages or disadvantages to each of those decisions?

14          MR. HENRY:  Yes, Your Honor.

15          THE COURT:  And do you believe he understands that

16 decision, has made his decision to not testify knowingly and

17 voluntarily?

18          MR. HENRY:  I do.

19          THE COURT:  Mr. Weng, let me ask you, sir.  Again,

20 please understand that I am not asking, nor should you reveal

21 the content of any conversation between you and your lawyer.

22     The -- did you hear what your lawyer just said that --

23 representing to the Court indicating that it is your decision

24 to not testify in your defense?

25          DEFENDANT WENG:  Yes.

1    THE COURT:  Did you understand what he said to me,
2 what he just described?
3    DEFENDANT WENG:  Yes.
4    THE COURT:  Do you agree with those statements?
5    DEFENDANT WENG:  Yes.
6    THE COURT:  And have you had ample opportunity to
7 discuss that decision with Mr. Henry?
8    DEFENDANT WENG:  Yes, sir.
9    THE COURT:  And you confirm for the Court that it
10 is your decision to not testify or put on any defense at this
11 time?
12    DEFENDANT WENG:  Yes.
13    THE COURT:  And you understand there will be an
14 instruction given to the jury indicating that that is -- that
15 decision cannot be held against you?
16    DEFENDANT WENG:  Yes.
17    THE COURT:  Does that open up anything else,
18 Mr. Henry?
19    MR. HENRY:  No.
20    THE COURT:  Thank you.  You may be seated.
21    MR. HENRY:  Thank you, Your Honor.
22    THE COURT:  Mr. Gallon, I ask you the same
23 questions.  Is it your intent to put on any evidence or have
24 your client testify in his defense?
25    MR. GALLON:  No, Your Honor, but we'd request a

1  short minute to be able to talk to my client.

2          THE COURT:  Absolutely.  Five, ten minutes, how

3  much time --

4          MR. GALLON:  Five minutes.

5          THE COURT:  Five minutes.  That will be fine.

6      And if you-all want to do it in place, I can either mute

7  the microphones or you can certainly step out in the hall if

8  you would prefer to do that as well.

9          MR. GALLON:  I would prefer to step out in the

10  hall.

11          THE COURT:  Thank you.  We'll be in a kind of

12  stand-in-place recess for five minutes.

13      (Brief recess.)

14          THE COURT:  We'll return to order.

15      Mr. Gallon, have you had a little additional opportunity

16  to confer with your client?

17          MR. GALLON:  I have, Your Honor.

18          THE COURT:  And is he choosing to testify at this

19  time?

20          MR. GALLON:  No, Your Honor.

21          THE COURT:  Okay.  Just out of an abundance of

22  precaution, have you had now -- I know we just took a few more

23  minutes.  Have you had ample opportunity to discuss with him

24  his right to testify, as well as his right to remain silent, as

25  well as any potential advantages or disadvantages to each of

```
 1    those decisions?

 2              MR. GALLON:  Yes, Your Honor.

 3              THE COURT:  And he is aware that if he chooses not

 4    to testify, I will instruct the jury that that is a decision

 5    that cannot be held against him?

 6              MR. GALLON:  Correct, Your Honor.

 7              THE COURT:  Do you believe that he understands that

 8    decision not to testify and has made his decision to not

 9    testify knowingly and voluntarily?

10              MR. GALLON:  I do, Your Honor.

11              THE COURT:  Thank you.

12        Mr. Lin, I know that you heard my questions of your

13    co-defendant.  And let me be sure that you understand, I am not

14    asking you about the content of any communication between you

15    and your attorney.

16        Do you understand that?

17              DEFENDANT LIN:  Yes.

18              THE COURT:  Did you hear that he announced -- or

19    represented to the Court indicating that it is your decision to

20    not testify in your defense in this case?

21              DEFENDANT LIN:  Yes.

22              THE COURT:  Did you understand what he said?

23              DEFENDANT LIN:  Yes.

24              THE COURT:  Do you agree with those statements that

25    he made?
```

1          DEFENDANT LIN:  Yes.

2          THE COURT:  And do you also agree that you have had

3   ample opportunity to discuss with him your right to testify or

4   your right to remain silent?

5          DEFENDANT LIN:  Yes.

6          THE COURT:  Do you have any additional questions of

7   him or need any more time to visit with him about that?

8          DEFENDANT LIN:  No.

9          THE COURT:  And you have confirmed for me that it

10  is your decision to not testify in your defense in this trial?

11         DEFENDANT LIN:  Yes.

12         THE COURT:  Thank you very much.  You may be

13  seated.

14     Let me now take up the -- is there -- you-all have been

15  presented copies of the Court's proposed instructions to the

16  jury.

17     Is there any objection to the Court's proposed

18  instructions and/or the verdict form as proposed by the Court,

19  by the government?

20         MR. MCGARRY:  No, Your Honor.

21         THE COURT:  Mr. Henry?

22         MR. HENRY:  No, Your Honor.

23         MR. BENNETT:  No, Your Honor.

24         THE COURT:  Thank you.  I'll note that there were

25  no objections to the Court's proposed instructions or the

1   proposed verdict form.

2        Closing arguments.  My intent is, is that we'll bring the

3   jury back up, I will instruct, and then we will go straight

4   into closing.

5        I'll give you a few minutes to collect your thoughts on

6   closing.  The -- I will ask for some weigh in -- or give you

7   the opportunity to weigh in in terms of timing permitted for

8   your closing.  I will say that with the trial only having been,

9   you know, a day and change, that includes jury selection, nine

10  witnesses and a single count, I'm inclined to think that 20

11  would be plenty.  I would say 25 is generous.  There's

12  certainly no requirement you have to use it all.

13        Is there any kind of request on behalf of the government?

14            MR. MCGARRY:  Your Honor, I was going to request 35

15  just for the fact that I have to address two defendants in

16  this, and it -- I anticipate taking -- you know, probably not

17  using all that time, just out of an abundance of caution,

18  considering the fact that I do have to address two different

19  defendants rather than one adds a little bit of time to

20  addressing each element per defendant.

21            THE COURT:  Mr. Henry?

22            MR. HENRY:  I mean, I think 15.  So I guess I'll

23  gift to the government the extra ten minutes that you were

24  going to give me.

25            THE COURT:  Well, so you were going to ask for 15?

1          MR. HENRY:  Right.  I was going to ask for 15.

2          THE COURT:  Mr. Gallon, Mr. Bennett?

3          MR. BENNETT:  15 or 20 is probably all we would

4   need, Your Honor.

5          THE COURT:  Mr. McGarry, I would say that, you

6   know, I kind of built that in thinking 20 would be sufficient.

7   I understand, it's a valid point that you have two defendants.

8   But still, the remaining facts are the same.

9      I'll -- I built that into the 25.  I'll give you-all 25.

10  I'll give each side 25, that's for each of you.

11     Please let Marcia know how you want to divide your time,

12  if you want a warning at what point in time.

13     How do you want to divide yours up, Mr. McGarry?

14          MR. MCGARRY:  I think I would reserve five minutes

15  for rebuttal.

16          THE COURT:  20 and five.

17     I would ask you-all to be -- you can certainly turn the

18  podium to the jury.  I'll remind you, stay anchored to that

19  podium, don't get out away from the podium.  Be mindful of the

20  stoplight.

21     I would prefer to not interrupt you, but when that light

22  turns red, you will get the hook.

23     So anything else?  We'll take a few minutes and let

24  you-all get your thoughts together.

25     Anything else before we take a short recess?

1          MR. MCGARRY:  Not from the government, Your Honor.

2          MR. HENRY:  No, Your Honor.  Thank you.

3          MR. BENNETT:  No, Your Honor.

4          THE COURT:  Is five minutes enough time for you

5     guys to get your thoughts together?

6          MR. MCGARRY:  That would be sufficient, Your Honor.

7          THE COURT:  We'll reconvene at a quarter after.

8        (Break taken, then the following record was made in open

9     court, in the presence of all parties, counsel, and in the

10    presence and hearing of the jury.)

11         THE COURT:  Ladies and gentlemen, all parties have

12    announced rest in their cases, and it is now time for me to

13    instruct you on the law and the instructions that you will use

14    in your deliberations.

15        Members of the jury, in any jury trial there are, in

16    effect, two judges.  I am one of the judges; you are the other.

17    I am the judge of the law.  You, as jurors, are the judges of

18    the facts.

19        I presided over the trial and decided what evidence was

20    proper for your consideration.  It is also my duty at the end

21    of the trial to explain to you the rules of law that you must

22    follow and apply in arriving at your verdict.

23        In explaining the rules of law that you must follow, first

24    I will give you some general instructions which apply in every

25    criminal case.  For example, instructions about burden of proof

1  and determining the believability of witnesses.  Then I will

2  give you the specific rules of law that apply to this

3  particular case.

4       Finally, I will explain the procedures that you should

5  follow in your deliberations and the possible verdicts you may

6  return.

7       These instructions will be given to you for use in the

8  jury room.

9       You, as jurors, are the judges of the facts.  But in

10  determining what actually happened, that is, in reaching your

11  decision as to the facts, it is your sworn duty to follow all

12  of the rules of law as I explain them to you.

13       You have no right to disregard or give special attention

14  to any one instruction or to question the wisdom or correctness

15  of any rule I may state to you.

16       You must not substitute or follow your own notion or

17  opinion as to what the law is or ought to be.  It is your duty

18  to apply the law as I explain it to you regardless of the

19  consequences.

20       However, you should not read into these instructions or

21  anything else I may have said or done any suggestion as to what

22  your verdict should be.  That is entirely up to you.

23       It is also your duty to base your verdict solely upon the

24  evidence without prejudice or sympathy.  That was the promise

25  you made and the oath you took.

1     The indictment:  The federal grand jury charges, in Count

2     1, drug conspiracy.  From on or about December 1st of 2022, the

3     exact date being unknown to the grand jury, through on or about

4     May 17th of 2023, in the Western District of Oklahoma and

5     elsewhere, Jeff Weng and Tong Lin knowingly and intentionally

6     conspired, combined, confederated, and agreed with each other

7     and others, both known and unknown to the grand jury, to

8     interdependently possess with intent to distribute and to

9     distribute 1,000 or more marijuana plants, a Schedule I

10    controlled substance, in violation of Title 21, United States

11    Code, Section 841(a)(1).

12    The indictment is the formal method of accusing the

13    defendants of the crimes charged.  It is not evidence of any

14    kind against the defendants and does not create any presumption

15    or permit any inference of guilt.  It is merely a charge or

16    accusation, nothing more and nothing less.

17    The government has the burden of proving each defendant

18    guilty beyond a reasonable doubt.  The law does not require the

19    defendants to prove their innocence or produce any evidence at

20    all.  The government has the burden of proving each defendant

21    guilty beyond a reasonable doubt, and if it fails to do so, you

22    must find that defendant not guilty.

23    Proof beyond a reasonable doubt is proof that leaves you

24    firmly convinced of the defendant's guilt.  There are few

25    things in this world that we know with absolutely certainty,

and in criminal cases the law does not require proof that overcomes every possible doubt. It is only required that the government's proof exclude any reasonable doubt concerning a defendant's guilt.

A reasonable doubt is a doubt based on reason and common sense after careful and impartial consideration of all the evidence in the case.

If, based on your consideration of the evidence, you are firmly convinced the defendant is guilty of the crime charged, you must find him guilty.

If, on the other hand, you think there is a real possibility that a defendant is not guilty, you must give that defendant the benefit of the doubt and find the defendant not guilty.

You have been permitted to take notes during the testimony in this case. If you have done so, you may refer to your notes during deliberations and discuss the contents of them with other jurors.

In your deliberations, give no more or no less weight to the views of a fellow juror just because that juror did or did not take notes. Your notes are not official transcripts, but are simply aids to your memory.

It is the testimony from the witness stand that must be the basis of your determination of the facts, and ultimately your verdict in the case.

1    You must make your decision based only on the evidence

2 that you saw and heard here in court.  Do not let rumors,

3 suspicions, or anything else that you may have seen or heard

4 outside of court influence your decision in any way.

5    The evidence in this case includes only what the evidence

6 -- what the witnesses said while they were testifying under

7 oath; the exhibits that I allowed into evidence; the

8 stipulations, if any, that the lawyers agreed to; and the

9 facts, if any, that I have judicially noticed.

10    Nothing else is evidence.  The lawyers' statements and

11 arguments are not evidence.  Their questions and objections are

12 not evidence.  My legal rulings are not evidence, and my

13 comments and questions are not evidence.

14    During the trial, to the extent that I did not let you

15 hear the answers to some of the questions that the lawyers

16 asked, or ruled that you could not see some of the exhibits

17 that the lawyers wanted you to see, or ordered you to disregard

18 things that you saw or heard, or struck things from the record,

19 you must completely ignore all of those things.  Do not even

20 think about them.

21    Do not speculate about what a witness might have said or

22 what an exhibit might have shown.  These things are not

23 evidence and you are bound by your oath not to let them

24 influence your decision in any way.

25    There are, generally speaking, two types of evidence from

which a jury may properly determine the facts of a case.  One
is direct evidence, such as the testimony of an eyewitness.
The other is indirect or circumstantial evidence, that is, the
proof of a chain of facts which point to the existence or
nonexistence of certain other facts.

As a general rule, the law makes no distinction between
direct and circumstantial evidence.  The law simply requires
that you find the facts in accord with all the evidence in the
case, both direct and circumstantial.

While you must consider only the evidence in this case,
you are permitted to draw reasonable inferences from the
testimony and exhibits, inferences you feel are justified in
the light of common experience.

An inference is a conclusion that reason and common sense
may lead you to draw from facts which have been proved.  By
permitting such reasonable inferences, you may make deductions
and reach conclusions that reason and common sense lead you to
draw from the facts which have been established by the
testimony and evidence in this case.

I remind you that it is your job to decide whether the
government has proved the guilt of each defendant beyond a
reasonable doubt.  In doing so, you must consider all of the
evidence.  This does not mean, however, that you must accept
all of the evidence as true or accurate.

You are the sole judges of the credibility or

believability of each witness and the weight to be given to the witness's testimony. An important part of your job will be making judgments about the testimony of the witnesses who testified in this case.

You should think about the testimony of each witness you have heard and decide whether you believe all or any part of what each witness had to say and how important that testimony was.

In making that decision, I suggest that you ask yourself a few questions:

Did the witness impress you as honest?

Did the witness have any particular reason not to tell the truth?

Did the witness have a personal interest in the outcome of this case?

Did the witness have any relationship with either the government or the defense?

Did the witness seem to have a good memory?

Did the witness clearly see or hear the things about which he or she testified?

Did the witness have the opportunity and ability to understand the questions clearly and answer them directly?

Did the witness's testimony differ from the testimony of other witnesses?

When weighing conflicting testimony, you should consider

whether the discrepancy has to do with a material fact or an unimportant detail, and you should keep in mind that innocent misrecollection, like failure of recollection, is not uncommon.

In reaching a conclusion on a particular point, or ultimately in reaching a verdict in this case, do not make any decisions simply because there were more witnesses on one side than on the other.

The defendants did not testify, and I remind you that you cannot consider this decision not to testify as evidence of guilt.

You must understand that the Constitution of the United States grants to a defendant the right to remain silent. That right means the right not to testify.

That is a constitutional right in this country. It is very carefully guarded, and you must not presume or infer guilt from the fact that a defendant does not take the witness stand and testify or call any witnesses.

The government called as one of its witnesses Brandon Ye, an individual who is a defendant in this judicial district, but in a different criminal case involving different charges.

The government has entered into a plea agreement with this individual providing for the dismissal of some charges and/or the recommendation of a lesser sentence than the individual would otherwise likely receive.

Plea bargaining is lawful and proper, and the rules of

this Court expressly provide for it.  A witness who has entered into a plea agreement with the government is not prohibited from testifying.  On the contrary, the testimony of such a witness may, by itself, support a guilty verdict.

You should receive this testimony with caution and weigh it with great care.  You should never convict a defendant upon the unsupported testimony of such a witness unless you believe the testimony beyond a reasonable doubt.

The fact that the witness has entered a guilty plea to the offenses charged against him is not evidence of the guilt of any other person.  In some cases, such as this one, scientific, technical, or other specialized knowledge may assist the jury in understanding the evidence or in determining a fact in issue.

A witness who has the knowledge, skill, experience, training or education may testify and state an opinion concerning such matters.

You are not required to accept such an opinion.  You should consider opinion testimony just as you consider other testimony in this trial.  Give opinion testimony as much weight as you think it deserves considering the education and experience of the witness, the soundness of the reasons given for the opinion, and other evidence in the trial.

You have heard the testimony of certain law enforcement officials.  The fact that a witness may be employed by the

federal, state, or city government as a law enforcement
official does not mean that his or her testimony is necessarily
deserving of more or less consideration or greater or lesser
weight than that of an ordinary witness.

You should consider the testimony of any law enforcement
witness and give it such weight as you think it deserves.

You have heard testimony as to the manner in which the
government conducted its investigation in this case, including
certain investigative methods or techniques that were used and
certain investigative methods or techniques that were not used.
In attempting to prove its case, the government is under no
obligation to use all of the investigative methods that are
available to it or to use any particular method.

The question is whether the evidence presented is
sufficient to convince you beyond a reasonable doubt of the
defendant's guilt.

The government must prove beyond a reasonable doubt that
the offense charged in this case was actually committed and
that the defendants committed it.  Thus, the identification of
a defendant as the person who committed the offense charged is
a necessary and important part of the government's case.

You should evaluate the credibility of any witness making
an identification in the same manner as you would any other
witness.

You should also consider at least the following questions:

1       Did the witness have the ability and an adequate

2   opportunity to observe the person who committed the offense

3   charged?

4       You should consider, in this regard, such matters as the

5   length of time the witness had to observe the person in

6   question, the lighting conditions at that time, the prevailing

7   visibility, the distance between the person and the person

8   observed, and whether the witness had known or observed the

9   person before.

10      Is the testimony about an identification made after the

11  commission of the crime the product of the witness's own

12  recollection?  In this regard, you should consider very

13  carefully the circumstances under which the later

14  identification was made, including the manner in which the

15  defendant was presented to the witness for identification and

16  the length of time that elapsed between the crime and the

17  defendant's subsequent identification.

18      If, after examining all of the testimony and evidence in

19  this case, you have a reasonable doubt as to the identity of a

20  defendant as the person who committed the offense charged, you

21  must find that defendant not guilty.

22      You are here to decide whether the government has proved

23  beyond a reasonable doubt that each defendant is guilty of the

24  crime charged.

25      The defendants are not on trial for any act, conduct, or

1    crime not charged in the indictment.

2        It is not up to you to decide whether anyone who is not on

3    trial in this case should be prosecuted for any of the crimes

4    charged.

5        The fact that another person also may be guilty is no

6    defense to a criminal charge.  The question of the possible

7    guilt of others should not enter your thinking as you decide

8    whether each defendant has been proved guilty of the crime

9    charged.

10        You will note the indictment charges that the crimes were

11    committed "on or about" certain dates.  The government must

12    prove beyond a reasonable doubt that the defendant committed

13    the particular crime on dates reasonably near the dates

14    charged.

15        The rights of each of the defendants in this case are

16    separate and distinct.  You must separately consider the

17    evidence against each defendant and return a separate verdict

18    for each defendant.

19        Your verdict as to one defendant, whether it is guilty or

20    not guilty, should not affect your verdict as to any other

21    defendant.

22        Defendants Jeff Weng and Tong Lin are charged in Count 1

23    of the indictment with a violation of Title 21, United States

24    Code, Section 841(a)(1).  This law makes it a crime for anyone

25    to conspire with someone else to violate federal laws

pertaining to controlled substances.  In this case the
defendants are charged with conspiracy to possess controlled
substances, marijuana plants, with intent to distribute and
distribution of those marijuana plants.

Marijuana plants are a Schedule I controlled substance.
To find a defendant guilty of this crime, you must be convinced
that the government has proved each of the following beyond a
reasonable doubt:

First, two or more persons agreed to violate the federal
drug laws, here, as described in Count 1, the federal drug law
prohibiting possession of controlled substances with intent to
distribute and distribution of the same; second, the defendant
knew the essential objective of the conspiracy; third, the
defendant knowingly and voluntarily involved himself in the
conspiracy and; fourth, there was interdependence among the
members of the conspiracy.

If you find that the government has proven each of these
four elements beyond a reasonable doubt and that the defendant
is, therefore, guilty of the offense charged, then you must
make a further determination beyond a reasonable doubt as to
the quantity of the controlled substances, and specifically
marijuana plants involved in the conspiracy from and after the
date the defendant became involved in the conspiracy.

You must make this determination as a specific finding on
the verdict forms where indicated, and your determination must

1 be unanimous.

2     A conspiracy is an agreement between two or more persons

3 to accomplish an unlawful purpose.  It is a kind of partnership

4 in criminal purposes in which each member becomes the agent or

5 partner of every other member.

6     The evidence may show that some other persons involved in

7 the alleged conspiracy are not on trial.  This does not matter.

8     There is no requirement that all members of a conspiracy

9 be charged or tried together in one proceeding.

10     A conspiracy to possess with intent to distribute means an

11 agreement to possess the controlled substance with the intent

12 to deliver or transfer possession of it to another person with

13 or without any financial interest in the transaction.  A

14 conspiracy to distribute means an agreement to deliver or

15 transfer possession of the controlled substance to another

16 person with or without any financial interest in the

17 transaction.

18     Each member of the conspiracy need not personally possess

19 with intent to distribute and/or distribute marijuana.  Rather,

20 the question is one of agreement.  Does the evidence leave you

21 convinced beyond a reasonable doubt that the defendant entered

22 into an agreement with the purpose that the controlled

23 substance would be possessed with the intent that it be

24 distributed and that it be distributed.

25     The evidence need not show that the members entered into

an express or formal agreement, nor does the law require proof that the members agreed on all the details. But the evidence must show that the members of the alleged conspiracy came to a mutual understanding to try to accomplish a common and unlawful plan.

If you are convinced that the charged conspiracy existed, then you must next determine whether the defendant was a member of that conspiracy, that is, whether the defendant knew at least the essential goals of the conspiracy and voluntarily chose to be part of it.

The law does not require proof that the defendant knew all the other members of the conspiracy or knew all the details about how activities were to be carried out. A person may belong to a conspiracy for a brief period of time or play a minor role.

On the other hand, proof is not sufficient if it merely shows that the defendant knew about the existence of the conspiracy or was associated with members of the conspiracy. Rather, the evidence must show the defendant knowingly joined the conspiracy with the intent to advance its purposes.

You are also required to find that interdependence existed among the members of the conspiracy. This means that the members intended to act for their shared mutual benefit.

To satisfy this element, you must conclude that the defendant participated in a shared criminal -- shared criminal

purpose and that his actions constituted an essential and
integral step toward the realization of that purpose.

When the word "knew" or "knowingly" is used in these
instructions, it means that the act was done voluntarily and
intentionally, and not because of mistake or accident.
Although knowledge on the part of the defendant cannot be
established merely by demonstrating that the defendant was
negligent, careless or foolish, knowledge can be inferred if
the defendant deliberately blinded himself to the existence of
a fact.  Knowledge can be inferred if the defendant was aware
of a high probability of the existence of the fact in question
unless the defendant did not actually believe the fact in
question.

In reaching your verdict, you are not to consider whether
marijuana is lawful or unlawful under Oklahoma state law.

If you find a defendant guilty, it will be my duty to
decide what the punishment will be.  You should not discuss or
consider the possible punishment in any way while deciding your
verdict.

If you want to communicate with me at any time during your
deliberations, please write down your message or question and
give it to the bailiff, who will bring it to my attention.  I
will respond as promptly as possible, either in writing or by
having you return to the courtroom so that I can address you
orally.

1    I caution you, however, that with any message or question

2 you might send, you should not tell me any details of your

3 deliberations or indicate how many of you are voting in a

4 particular way on any issue.

5    Let me remind you again that nothing I have said in these

6 instructions, nor anything I have said or done during the

7 trial, was meant to suggest to you what I think your decision

8 should be.  That is your exclusive responsibility.

9    Checking to be sure I didn't skip one.

10    Counsel will now be allowed to make closing arguments.

11 You are reminded that what the lawyers say is not evidence.

12    It is intended to assist you in recalling the evidence and

13 to suggest inferences you may wish to draw, but you are not

14 bound by what the lawyers say in closing arguments.

15    It is your recollection of the evidence and the inferences

16 you choose to draw, that control.

17    Counsel may refer to the instructions that I have given

18 you about the law you are to apply when deciding this case.  In

19 that regard, if there is any inconsistency between what counsel

20 may say about the instructions and the actual instructions I

21 have given to you, you must apply the instructions as I have

22 stated them.

23    Because the government has the burden of proof, the

24 government will go first, then the defendants will make their

25 closing arguments, and then the government will complete the

1    arguments by presenting a rebuttal argument.

2        Counsel for the government, you may proceed with your

3    closing arguments.

4            MR. MCGARRY:  May it please the Court, counsel.

5    Ladies and gentlemen of the jury, 19,661 marijuana plants.  In

6    four months, more than one ton of marijuana, easily exceeding

7    1.5, perhaps as much as $6 million worth of illegal inventory

8    and product from Jeff Weng's marijuana grow loaded by Tong Lin

9    into the back of Brandon Ye's van, typically his fake Amazon

10   delivery van, which that marijuana was later shipped out of

11   Oklahoma on an 18-wheeler semi truck.

12       So the question here, did Jeff Weng and Tong Lin conspire

13   to possess with intent to distribute and distribute marijuana

14   plants?  We submit that the evidence overwhelmingly shows the

15   answer to this question is yes.

16       At the beginning of the trial, my co-counsel told you this

17   isn't a complex case.  And I submit, after seeing the evidence,

18   you have seen that it is not a complex case.  It's

19   straightforward.  Marijuana is an illegal drug, and the

20   evidence shows that Jeff Weng and Tong Lin conspired to

21   possess, distribute and profit off the distribution of

22   marijuana and marijuana plants at a very large scale, in fact,

23   tons of it, worth millions, big money, the illegal way.

24       This all started in December of 2022 when FBI Task Force

25   Officer Chad Vontugeln observed a fake Amazon delivery van

make a drop-off of marijuana in black trash bags at a residence
in Oklahoma City.

When TFO Vontungeln focused his investigation and
surveillance on the activity and movement of that fake Amazon
delivery van, he uncovered a vast criminal distribution network
fueled by Jeff Weng and Tong Lin and facilitated by Brandon Ye
driving that fake Amazon delivery van on a near daily basis
from his house in Oklahoma City in the Western District of
Oklahoma to marijuana grows throughout Oklahoma.

As you heard, after -- after Mr. Ye would pick up
marijuana from a grow, he would take it back to his stash house
located in Oklahoma City where it was stored until he and his
associates took it to a warehouse where a semi truck would be
loaded with more than 2,000 pounds, a literal ton of marijuana,
to be shipped out of Oklahoma.

One of these grows that Mr. Ye would drive to was located
in Wetumka, Oklahoma, and operated by Jeff Weng and Tong Lin.

Mr. Weng, as you heard in his own words, was the admitted
manager of the grow, and Tong Lin, his right-hand man, the
admitted intern manager.  And I submit to you that both were
knowing participants in an illegal drug distribution pipeline,
a criminal conspiracy.

Early in the investigation, TFO Vontungeln placed a GPS
tracker on Mr. Ye's fake Amazon van.  That GPS tracker
confirmed Mr. Ye would drive his fake Amazon delivery van six

times between January of 2023 and his arrest on March 31st of
2023.  He'd drive from Oklahoma City to Jeff Weng's grow and
back to Oklahoma City where he would then ultimately load that
marijuana on the back of a semi and out of Oklahoma.

You heard from Brandon Ye himself.  And he said he drove
to Jeff Weng's grow 10 to 15 times between December of '22 and
his arrest in March -- on March 31st, 2023.  Every time Tong
Lin helped load cardboard boxes of marijuana in Brandon Ye's
van.  Every time Ye picked up 150 to about 200 pounds of
marijuana.

That's -- when you do the math there, ladies and
gentlemen -- I know lawyer math is rough -- but when you do the
math there, that's over one ton of marijuana.

And as part of the investigation on February 17, 2023,
agents with the Oklahoma Bureau of Narcotics, including Special
Agent Cody Gibson of the marijuana enforcement unit, went to
Mr. Weng's grow by the request of the FBI.

There he spoke to Mr. Weng on the phone and Mr. Weng told
Agent Gibson that he was the manager of the grow.

Agent Gibson encountered Tong Lin, who helped show Agent
Gibson around.  There, Agent Gibson identified more than 15,000
marijuana plants in various stages of growth.

And he testified this was not hemp, but marijuana plants.
He observed processed marijuana in cardboard boxes.

After this OBN inspection, federal law enforcement

executed a search warrant on May 17th, 2023, at Jeff Weng's
grow.

There, agents found Jeff Weng and Tong Lin, along with
more than 19,000 marijuana plants.  Outside of the marijuana
grow room, agents found clipboards with the initials T.L., or,
I would submit, Tong Lin.

Agents located more than 20 rooms which contained
marijuana plants.  Inside the grow rooms, agents found row
after row of marijuana plants in various stages of growth.

In one room alone, as Agent Espinoza testified, he counted
more than 1,000 marijuana plants.

In addition to agents identifying themselves the plants as
marijuana plants, a sample of the plants confirmed the plants
to be marijuana.

When searching the primary residence of Jeff Weng's grow,
Agent Deliberato identified the master bedroom as Jeff Weng's.
Agents observed luxury goods, which was in stark contrast to
the living conditions of the barracks where those living
conditions were abysmal.  And in the closet attic space, Agent
Deliberato found hidden away more than $100,000 in
vacuum-sealed cash.

In the office, Jeff Weng's office, agents found
ammunition, bank cards, and other items showing his
information.

Agents also found a holster and a firearm, which Jeff Weng

1 claimed as his.

2     When interviewed, Mr. Weng, who was the only person who

3 could speak English, told agents he was the manager and had

4 worked there for two years.  He said he was paid 3,000 to 4,000

5 a month.

6     Tong Lin, who was also interviewed, told agents he was the

7 management intern and that he shadowed Jeff Weng, that he was

8 paid 2,500 per month by Mr. Weng.

9     Jeff Weng and Tong Lin have been charged with one crime

10 here, conspiracy to possess marijuana plants with intent to

11 distribute them and distributing them.  And I submit that the

12 evidence shows that both Jeff Weng and Tong Lin are guilty

13 beyond a reasonable doubt of that charged crime.

14     While the government bears the burden to prove beyond a

15 reasonable doubt the charged crime, we welcome that burden.

16 You have also been instructed that beyond a reasonable doubt

17 does not mean beyond all doubt.

18     Reasonable doubt is doubt based on reason and -- and is

19 based on reason and common sense after impartial consideration

20 of all the evidence.

21     Now, as a jury, you have been instructed to leave your

22 biases and preconceptions at the door, but you have not been

23 told to leave your common sense.  And I would submit to you

24 that your common sense is the most important tool you have in

25 this case.

1    So with that in mind, let's look at the charge.

2    As we have mentioned, Count 1 of the indictment charges

3  Jeff Weng and Tong Lin with conspiracy to possess marijuana

4  plants with intent to distribute them.

5    The judge has given you the law.  So when you deliberate,

6  please refer to the judge's instructions for the law.

7    But for this, you must prove four things.  First, that the

8  defendant agreed with at least one other person to violate

9  federal drug laws.  Here, the federal laws prohibiting

10 possession of controlled substance with intent to distribute

11 them; second, the defendant knew the essential objective of the

12 conspiracy; third, the defendant knowingly and voluntarily

13 involved himself in the conspiracy and; fourth, there was

14 interdependence among the members of the conspiracy.  That is,

15 the members in some way or manner intended to act together for

16 their shared mutual benefit within the scope of the conspiracy.

17    What does this really boil down to?  Well, first, that the

18 defendants agreed to do something illegal, here violate federal

19 drug laws.  A conspiracy is a simple agreement between two or

20 more people, a partnership, a mutual understanding.  Folks,

21 simply it's just being partners in crime.  Second, the

22 defendants understood what they were doing.  Third, they chose

23 to do it.  Fourth, they played a role.  It's simple, a drug

24 conspiracy.

25    Jeff Weng and Tong Lin and Brandon Ye, using his fake

1  Amazon van, were partners in crime engaged in a drug

2  conspiracy.

3       We know Jeff Weng was a part of this conspiracy and

4  knowingly agreed to participate in it, and I submit the

5  evidence shows he played a large role.  He was the manager of

6  the marijuana grow.

7       We could almost stop there, folks.  Mr. Weng managed a

8  marijuana grow with more than 19,000 marijuana plants in

9  various stages of growth ensuring a continuous stream of

10  illegal product.  It's illegal here in Oklahoma, Texas, New

11  York.  There isn't one state in which it's federally legal to

12  possess and distribute marijuana.  You have been instructed the

13  same.  You have taken an oath to apply the law, and that's all

14  we're asking you to do here.

15       We know Jeff Weng knowingly agreed with Tong Lin to

16  distribute those marijuana plants.  Being the manager, he

17  agreed with Tong Lin and everyone else at the grow to grow,

18  process and distribute marijuana plants.

19       He understood what he was doing.  He was paid to manage

20  the grow.  He was there to make money from the unlawful sale of

21  marijuana and marijuana plants.

22       He had the master bedroom, the office at the grow.  He's

23  the person who has all the various banking documents.  He's the

24  only one who spoke English.  He's the person in charge of this

25  operation, exercising his control over the illegal operation.

1     Folks, everybody has a boss, and the boss here was Jeff

2  Weng.  Tong Lin's boss, he was the boss of this conspiracy, an

3  operation with the sole purpose of growing and distributing

4  marijuana plants for illicit profit.

5     But there's more to it than this.  Jeff Weng was the boss

6  of a marijuana grow where that marijuana was being loaded in

7  the back of a fake Amazon delivery van like clockwork, time and

8  time again, transported to Oklahoma City, where it was shipped

9  on a semi truck out of this state.

10     We know Jeff Weng knowingly agreed and conspired with

11  Brandon Ye.  Ye's role in this conspiracy, Jeff Weng's

12  conspiracy, was to distribute the marijuana.  Members of a

13  conspiracy don't have to be charged together.  As you have been

14  instructed, they do not even need to know each other or know

15  all the details about the activities conducted.

16     Sure, Brandon Ye doesn't know Jeff Weng, and this makes

17  sense.  Mr. Weng is the manager.  He's not the labor loading up

18  the cardboard boxes of marijuana.  He's not the boots on the

19  ground like Tong Lin.  But Brandon Ye, Tong Lin are vital links

20  in the conspiracy in order for Jeff Weng to achieve his goal of

21  managing his grow to make money off the distribution of

22  marijuana plants.

23     Applying our common sense, the sheer size and scale of the

24  operation tells us Jeff Weng knew and voluntarily participated

25  in this criminal conspiracy.

Jeff Weng is trying to make money, pretty simple, to buy
those luxury goods and items found in his room, live a life
different from those workers who were living in the barracks.

You heard that at the time Brandon Ye was picking up
marijuana from Mr. Weng's grow, that the street value of
marijuana was somewhere between, I think it was 17,000 and
$2,000 per pound.

And Brandon Ye told you that in a four-month period he
picked up somewhere between 150 to 200 pounds of marijuana on
10 to 15 different occasions.

Folks, conservatively, if we just even just rest on the
six trips that were shown by the GPS tracker at 150 pounds per
trip, and the low end of $1,700 per pound, that's over
$1.5 million in product.

On the other hand, if you look at it at 15 trips at
200 pounds per trip at nearly $2,000 a pound, that's upwards of
$6 million of illegal product.

I submit to you there's not a manager of any business who
doesn't know about $6 million worth of product being sold, let
alone a manager who doesn't know about $1.5 million of product
being sold.  That just doesn't disappear without the boss
knowing.

Jeff knew -- Mr. Weng knew what was going on.  It's his
business.  It's big business, and the product was an illegal
drug.

1    You heard from Agent Shutts that Mr. Weng possessed a gun,

2  a holster and ammunition.  This shows he knew he was engaged in

3  illegal drug dealing and intended to do the same.

4    Drug dealing is a dangerous endeavor.  And as Agent Shutts

5  testified, drug dealers use firearms to protect themselves and

6  their money.

7    Speaking of money, more evidence of Mr. Weng's knowing

8  involvement as you heard from Agent Deliberato, he found more

9  than $100,000 of vacuum-sealed cash hidden away in Mr. Weng's

10  attic above his closet.

11    Using our common sense we can ask, who does that?  I

12  submit drug traffickers.  That's it.

13    Mr. Weng also had multiple bank cards.  So he knows how to

14  access the banking system, so why leave this bulk cash vacuum

15  sealed and hidden away in his attic if it isn't from illegal

16  drug dealing?

17    Folks, the evidence shows that Mr. Weng understood what he

18  was doing, chose to do it, and played a vital role.

19    Applying our common sense, we can check off each of the

20  four elements as having been proved beyond a reasonable doubt

21  and find Mr. Weng guilty.

22    We know Tong Lin knowingly agreed and conspired with

23  Mr. Weng to distribute marijuana plants and played a vital

24  role.  Tong Lin said he was the management intern for Mr. Weng

25  at his grow of more than 19,000 marijuana plants.  He said he

1   was paid 2,500 bucks per month by Mr. Weng for his work.  He

2   agreed to work for Mr. Weng at the grow to help grow and

3   distribute marijuana.

4       I submit that you saw Tong Lin's initials on the

5   clipboards outside the grow rooms, checking off their to-do

6   lists for growing those marijuana plants.  All of this for the

7   end goal of distributing those plants.

8       Tong Lin was Jeff Weng's boots on the ground, getting the

9   job done, making sure the conspiracy worked.  I submit right

10  there you can check off all the elements for conspiracy for

11  Mr. Lin.

12      But we also know that Mr. Lin agreed and conspired with

13  Brandon Ye.  They may not have spoken to each other or even

14  known each other's name, but that's not what drug dealers do.

15  They don't want to make friends.  They want to make money and

16  they want to sell as much illegal product as possible.

17      And we know Tong Lin agreed with Brandon Ye because Tong

18  Lin helped load Brandon Ye's fake Amazon van, sometimes his

19  other van, full of cardboard boxes full of marijuana, ten or

20  more boxes of marijuana at a time, 10 to 15 times over just a

21  four-month period of time.

22      Folks, Tong Lin didn't do this just once or twice, he did

23  this 10 to 15 times.  This shows he knew what he was doing and

24  he chose to do it repeatedly.

25      And this only worked to achieve Mr. Weng and Mr. Lin's

goal of selling and distributing marijuana.

The GPS data confirmed that Mr. Ye drove that fake Amazon van to Jeff Weng's grow six times. In fact, the January data showed nearly weekly trips to the grow.

So we can apply our common sense and know that Tong Lin agreed to do something illegal with Jeff Weng and Brandon Ye. That something illegal was to possess marijuana plants and marijuana with intent to distribute.

Lin's actions show he understood what he was doing, he chose to do it, and he played a vital role in this conspiracy.

Applying our common sense, we can check off each of the four elements as having been proven beyond a reasonable doubt and find the defendant Tong Lin guilty.

Ladies and gentlemen, as I mentioned at the beginning -- or as was mentioned at the beginning, and I mentioned at the beginning of my closing, this is a straightforward case.

The evidence and testimony shows that Jeff Weng, Tong Lin and Brandon Ye were partners in crime. They agreed and conspired to possess with intent to distribute marijuana plants, 19,661 of them, and that is why you should find the defendants Jeff Weng and Tong Lin guilty.

MR. HENRY: May I, Your Honor?

THE COURT: Yes. Thank you.

Mr. Henry, I'll now recognize you for any closing argument on behalf of your client.

1          MR. HENRY:  Thank you.  Good afternoon.

2      We all like to be kind of liberal and color out the lines

3  when we get up here and talk.  I missed the point where someone

4  came in and testified that Jeff Weng was the owner of this

5  place.  In fact, the agents testified that they spoke to an

6  owner.

7      The FBI agent, the gentleman with all the training and

8  experience, he said, "Yeah, yeah, some of our agents talked to

9  the owner on the phone.  I wasn't there, but I was told they

10  talked to the owner."

11      Mr. Weng is not the owner.  He may be there as a manager,

12  but let's talk about how people acted when this happened.

13      First, OBN shows up.  They're going to do an inspection

14  because the FBI asked them to.  Someone at the grow farm calls

15  Mr. Weng, and what does Mr. Weng say?  "Don't come in my place.

16  You got a warrant?  Stay out.  Don't have to let you in."

17  They're asking for permission.

18      If you know you're doing something wrong like the

19  government just said, if you're doing all this illegal stuff,

20  you're letting people in?  He says, "Sure, go on in.  Have

21  someone show you around.  If you have any questions or

22  concerns, please call me back."

23      They leave.  The agents come back at some other point when

24  they do their raid, he is there.  What do they say then?  Does

25  he run away?  Do people scurry like you hear about?  No,

they're there.  They're there and they give interviews.  They
talk to the police.

In fact, he tells the police this -- I'm -- I'm not from
around here.  I'm from back east where we don't have guns, as
problems with -- that you have here.  I don't mean that in a
good way or a bad way, but if I was protecting my $10 million
worth of marijuana, I think I would have more than a .45
unloaded in the laundry room in the locked box.

I mean, that's where the gun is, unloaded in a laundry
room in a locked box.  What are you protecting with that?

So Mr. Lin lets them in, walks them around, talks to them.
They -- their interview, all the people there, it's not what
drug dealers do.  They run.  They have an escape plan.

It's either Mr. Weng is never there when Mr. Ye comes
because he's smarter than that or he's there and works with --
and cooperates with law enforcement because, what, he's dumber
than that?

Mr. Ye shows up.  He says that he sees Mr. Lin there.  He
sees Mr. Lin's car.  He doesn't ID Mr. Weng's car.  There is no
evidence that Mr. Weng, who is there helping the owner, working
for the owner, making $3,000 a month, being paid by the owner,
knew what Mr. Ye was doing.  He's not there.

The presumption you guys can make is they must have shown
Mr. Ye Mr. Weng's photo like they showed Mr. Ye Mr. Lin's
photo.  He didn't identify him.  He wasn't there.

1    And now, when the government talks about 6 million, 10

2  million, 20 million, the -- the agent used a phrase that -- an

3  educated phrase, says, that's street value.  That's end-user

4  value.

5    Well, so you're either the producer of something that

6  works its way through a supply chain before it gets sold.  We

7  all know that wholesale is a whole different thing.  The $200,

8  $100 an item than one that's making -- being sold on the -- at

9  a store for a different price.

10    So don't -- don't -- the government likes to throw out

11  these big numbers to, I don't know, paint outside the lines.

12  But bottom line is that the government has to prove beyond a

13  reasonable doubt that Mr. Weng conspired with Mr. Ye and

14  Mr. Lin at the times those sales were -- those deliveries were

15  done to conspire to sell that marijuana illegally.

16    I don't see where they have produced that evidence.

17  Mr. Ye, he was busy.  He went all over.  But when asked about

18  going to this farm, he said "approximately."  Everything he

19  gave was approximate.

20    His honor just read you reasonable doubt.  I didn't hear

21  where he said "approximate" was the way you could find somebody

22  guilty.  You won't hear that reasonable -- guilt beyond a

23  reasonable doubt is "I approximately believe that person is

24  guilty."  That's not beyond a reasonable doubt.

25    In fact, we all could think that more than likely he did

1     it, he probably must have done it.  In fact, it's more likely

2     than not he did it.  None of those are beyond a reasonable

3     doubt.

4         The government must prove each and every element that

5     Mr. Weng participated in this conspiracy to possess and

6     distribute, not just possess, possess and distribute marijuana

7     from a farm that there is no evidence is his farm.

8         In fact, as I said before, the evidence is that there's an

9     owner.  Mr. Lin tells the agents there's an owner.

10         They have not met their burden.  It is their

11     responsibility to meet their burden, and we as a society force

12     that responsibility on them because that's what gives us in

13     this country protections from the government, to make sure that

14     they do their job.  You-all are the backstop of that.

15         Thank you.

16             THE COURT:  Thank you, counsel.

17         Mr. Bennett, the Court will recognize you for any closing

18     argument you have on behalf of your client.

19             MR. BENNETT:  Thank you, Your Honor.

20         All right, ladies and gentlemen.  We have made it to the

21     end of this trial.  Thank you for taking all this time, and I

22     know you have carefully considered this case.

23         So first thing I want to start with is something that's

24     already been hit on, but it's the burden of proof and

25     presumption of innocence.  I'm not going to go through all of

1    it again.  But we know the burden of proof lies at this table,

2    with the government.  They have the duty and the responsibility

3    to prove the case.

4        Remember, the defense has no burden.  Why is that

5    important?  Because when you couple that with the presumption

6    of innocence, a defendant comes into trial presumed innocent.

7    They are innocent the day they walk through that door and the

8    day they sit at that table.  Okay?

9        And you may think, well, you know, what's that really

10   matter?  It does matter because we have to hold the government

11   accountable to that burden.

12       So I want to go through a little of this with you real

13   quick.  And what I'm going to do is I'm going to be looking at

14   some of these jury instructions that you will get and the ones

15   that the judge read to you.

16       So I'm looking at instruction 19.  This just tells you

17   what the elements that must be proven are.  Okay?

18       So first, two or more persons agreed to violate the

19   federal drug laws here as described in Count 1, the federal

20   drug law prohibiting possession of controlled substances with

21   intent to distribute and distribution of the same.  Okay?  They

22   have got to prove that beyond a reasonable doubt.

23       Second, the defendant knew the essential objective of the

24   conspiracy.  So they have to prove Tong Lin knew what the

25   objective was.  Okay?

1    Third, the defendant knowingly and voluntarily involved
2  himself in the conspiracy.  So again, they have to prove Tong
3  Lin involved himself in the conspiracy and that it was knowing
4  and voluntary.
5    Fourth, there was interdependence among the members of the
6  conspiracy.  And I'll get into that a little bit later because
7  that's one of the next ones I'm going to go into.
8    But as I go through these, I want you to think about what
9  evidence did the government present that proves this.  Okay?
10 Each one of these.
11   So number 20, it goes through the agreement.  Okay?  So it
12 goes through all this stuff that, you know, each member of the
13 conspiracy need not personally possess with intent to
14 distribute or distribute marijuana.  Rather, the question is
15 one of agreement.  This is in the final paragraph of
16 instruction 20.
17   So the question is one of agreement.  Does the evidence
18 leave you convinced beyond a reasonable doubt that the
19 defendant, Tong Lin, entered into agreement with the purpose
20 that the controlled substance would be possessed with the
21 intent that it be distributed.  Okay?
22   What evidence did you hear in these last two days that
23 showed Tong Lin entered into any form of agreement to traffic
24 drugs or to distribute drugs?  Think about it.  What did you
25 see?

Brandon Ye, that's the only person that could even really say anything involving Tong Lin. And we'll get back to Mr. Ye later, but I want you to think about that for now. What did you hear that makes you think that he formed any form of agreement with anybody?

Next one, in instruction 21, this last sentence here -- well, I'll read the whole thing.

"The evidence need not show the members entered into an express or formal agreement." So we don't have to find a contract. They didn't have to write it out. Okay?

But this last sentence, "But the evidence must show that the members of the alleged conspiracy came to a mutual understanding to try to accomplish a common or unlawful plan."

Again, what evidence did you hear that even shows a mutual understanding between Tong Lin and anyone else?

22, membership: "If you are convinced that the charged conspiracy existed," and then it goes on and it says, "then you must next determine whether the defendant was a member of the conspiracy, that is, whether the defendant knew at least the essential goals of the conspiracy and voluntarily chose to be a part of it."

Okay. Did you hear anything that shows that Tong Lin knew anything about that? No.

And it goes on a little bit later where it talks about what is sufficient proof and what is not. All right. And this

1    is the part I want you to remember.  "On the other hand, proof

2    is not sufficient if it merely shows that the defendant knew

3    about the existence of the conspiracy."  So even if he knew

4    about it, that's not enough to show you're involved.

5         And that makes common sense, you know?  You know, the

6    government talked about common sense and we don't leave that at

7    the door.  Just because you know somebody's doing something

8    they shouldn't be doing doesn't mean you're a part of it

9    because you didn't make that agreement, you don't have that

10   mutually beneficial agreement to benefit from the conspiracy.

11   You just have knowledge that it happened.  Okay?

12        Says, "Rather, the evidence must show that the defendant

13   knowingly joined the conspiracy with the intent to advance its

14   purposes."

15        What did Tong Lin do to advance these purposes?  Brandon

16   Ye, again, we'll get back to Mr. Ye's reliability, but you

17   didn't hear anything else, did you?

18        Number 23, interdependence.  "To satisfy this element, you

19   must conclude that the defendant participated in a shared

20   criminal purpose and that his actions constituted an essential

21   and integral step toward the realization of those purposes."

22        Okay.  So again, what did Tong Lee (sic) do that was

23   essential for this conspiracy or an integral step toward the

24   realization of the purpose?

25        All right.  So what have -- what's the government actually

1    shown?

2        All right.  Let's think back.  OBN agent shows up, talks

3    to people.  Is anyone arrested that day?  The OBN agents say I

4    saw some stuff being taken off the property or anything being

5    delivered that day?  No.  He goes in and he talks to people,

6    that's it.

7        Now, that same OBN agent, Mr. Gibson, who didn't arrest

8    anybody, I hope you caught whenever the government was

9    discussing -- or questioning him, he seems to have a very

10   impressive ability to differentiate marijuana from other

11   substances.

12       Do you remember his testimony?  "Oh, yeah, I have been

13   trained, I can look at it and I can see the difference between

14   hemp and marijuana."  And you're probably sitting there

15   thinking like, must have been a -- what are you talking about

16   with this hemp and marijuana?  What's it matter?  Okay.  This

17   is where it matters, because remember that presumption of

18   innocence and that burden of proof?  They have that burden.

19       They have to prove it was marijuana.  Okay?  And we can't

20   even eliminate him because, if you remember, when the

21   criminalist sat up there on that stand and I asked her with her

22   gas chromatography and mass spectrometer if she could

23   quantitatively tell me this is marijuana versus hemp, what did

24   she say?  No.

25       And then I asked her other questions about her visual

examination with the aid of a microscope. Said, "Okay. Well, what can you tell from that? Well, it has these hairs. Other stuff have hairs? Yeah.

So it can't show that it's even marijuana, you know. But this OBN agent, I don't know, maybe he has special vision, I don't know -- wears better glasses than what I wear sometimes. I don't know.

But that's the point, that's the government's burden and they didn't even meet that because they can't even exclude him. Okay?

So what tied Tong Lin to any of this? First, if you remember, the agents got up there and we went through the -- the pictures of the farm, all of that stuff.

During that, I hope you noticed I asked those agents questions. Okay. The -- this bag of money, find anything tying Tong Lin to that? Nope.

Okay. All these passports, anything like Tong Lin's passport in there? Nope.

The first FBI agent, I believe it was Agent Della- -- I would just butcher his name, so I'm not even going to try from there. But you remember he came up there and he seemed to think Tong Lin lived there. And then I asked him, like, "Okay. Well, what evidence do you have of that? Do you have a passport?" "No." "Find any of his belongings there?" "No."

He couldn't even identify what made him think that because

there was no evidence that Tong Lin lived in that main house at all.

And it was confirmed by the next FBI agent that took the stand and I asked him the same thing. "Did you see anything with Tong Lin's, you know, hidden money?" "Nope." "See anything with his IDs or his credit cards?" "Nope."

Nothing was found there except some sign-in sheets.

Now, the government says that, "well, those are Tong Lin's initials." Did you hear any testimony that confirmed those are Tong Lin's initials even? No.

But just for the subject of our argument, let's say that they did have proof. What does that show? It was a cleaning schedule. It's no different than the same thing that you see on the doorway whenever you go to a gas station and it says when was the last time this restroom was cleaned, 2:14 p.m.

Does that show a drug conspiracy? Does that show agreement? Does that show Tong Lin furthering that agreement? No, it doesn't.

Even if it's true and they didn't even have -- somebody testified that it was his initials, so it proved nothing.

The GPS. Okay. GPS still doesn't tie Tong Lin. I asked the agent, last witness, did you surveil, did you see Tong Lin there during all of these things while you were tracking? They don't have that.

They have Brandon Ye. And that's how we get to Mr. Ye,

finally.  Okay.  This is what we have to look at with Mr. Ye,
and I'm going to point you to instruction number 15.  It's
called identification testimony, and specifically this last
paragraph.

"Is the testimony about an identification made after the
commission of the crime the product of the witness's own
recollection?  In this regard you should consider very
carefully the circumstances under which the later
identification was made."

Because remember, Brandon Ye did not identify Tong Lin.
He was arrested in March.  He made this identification a few
weeks ago, based upon his own testimony up there.

So it was not "I get arrested today and, oh, yeah, this
guy's my buddy and he helped me."  This came out months later.

So carefully consider the circumstances -- circumstances
under which the later identification was made, including the
manner in which the defendant was presented to the witness for
identification.

So let's talk about that real quick.  What did he say
happened whenever he identified it?  They said, "Hey, here's a
picture of a guy.  You know him?  Yep."

That's it.  You didn't hear about a lineup.  You didn't
hear about any of the safeguards to try to look at this and
say, "Okay.  Well, here's like ten guys, which one is he?"
Didn't hear any of that.

1    Mr. Ye has every motivation to lie, every motivation to

2  fabricate.  You heard his testimony.  He's already pled guilty,

3  and he didn't even say anything about Wetumka or Mr. Lin until

4  after he had already done it.

5    People will do anything to stay out of jail or get out of

6  jail.  Next thing is, "and the length of time that elapsed

7  between the crime and the witness's subsequent identification."

8  Months went by, again.

9    And what finally prompted him to say, "Oh, yeah, I

10 remember now"?  Pleading guilty and being put in jail, pretty

11 good motivation.

12   "If, after examining all of the testimony and evidence in

13 this case, you have a reasonable doubt as to the identity --

14 the identity of the defendant as the person who committed the

15 offense charged, you must find that defendant not guilty."

16   So let's boil all this down, basically, one thing.  I'm

17 going to ask you to believe the agents who said, "No, I didn't

18 find anything involving Tong Lin.  No, we didn't have

19 surveillance of Tong Lin doing anything."

20   The government's going to ask you to believe Brandon Ye,

21 our friend in his orange outfit trying to avoid prison for the

22 rest of his life.  Which one should you believe?

23   The government also talked about, you know, the living

24 standards and everything there.  Again, nothing tied Tong Lin

25 to those rooms, to the main house, to anything except for

1   Brandon Ye.

2       So again, I ask you to look at the other evidence, weigh

3   that against Mr. Ye's desire to lie and to save his own hide.

4       So at this point I would ask you to find Mr. Lin not

5   guilty.

6       Thank you.

7           THE COURT:  Thank you.  Government may give their

8   final closing.

9           MR. MCGARRY:  Ladies and gentlemen, you're the

10  trier of fact, and as such, you should rely on your collective

11  memory when you deliberate.

12      What Mr. Henry said, what Mr. Gallon said, and what

13  Mr. Bennett said, what I said is not evidence.  The only

14  evidence you should consider is the evidence you heard on the

15  witness stand and the evidence and those exhibits that were

16  admitted.

17      Folks, I don't want you to lose the forest for the trees

18  here.  I think when you look at all this and you consider the

19  evidence, what you're going to see here is a black market

20  marijuana operation and what was going on wasn't legal in any

21  type of system using a fake Amazon delivery van being loaded up

22  with cardboard boxes of marijuana by Tong Lin at a marijuana

23  grow operated by Jeff Weng.  That only says black market

24  marijuana and that says conspiracy.

25      And using this fake Amazon delivery van just goes to the

level of deception at every angle that these folks were willing
to go to and that they employed in this.

And now so a couple of points came up about ownership.
Ownership is irrelevant to you to finding whether there's a
conspiracy.  It's not a requirement of the conspiracy.

You know, some other points came up.  Well, they gave
statements to the FBI.  Yeah, well, the FBI was there.  The
jig's up, folks.  The black market marijuana has been busted.

You know, Weng -- Mr. Weng isn't growing or possessing
marijuana for nothing.  It's for a profit.  That day that FBI
agent showed up, there were 19,661 marijuana plants.  Marijuana
is illegal, and that was shown time and time again.

Remember, after Mr. Bennett's questions, I believe
Ms. Aviles said it was marijuana.  Folks, it's not that
complicated.  Agent after agent testified that it was marijuana
plants.

And it turns out that Cody Gibson was right, Agent
Espinoza was right.  All the agents that you heard testify up
there that said it was marijuana, based on the results of that
test, showed that these were, in fact, marijuana plants.

And again, there's a lot of talk about, you know, being in
this conspiracy and what makes it.  Again, applying our common
sense, folks, it's a drug conspiracy.  Like I said, it doesn't
have to be a formal agreement, unspoken or spoken.

And in, fact, we don't know what people are thinking.  We

don't know what Mr. Lin is thinking at any one time, what
Mr. Weng is thinking at any one time. But actions sure do
speak louder than words, and actions show us here, loading up a
fake Amazon van 10 to 15 times shows us exactly what he
intended to do.

And you saw the evidence, that master bedroom and all of
Mr. Weng's stuff, that office that had all of Mr. Weng's stuff,
he was the manager of this grow. He may not have owned it, but
it sure was his, and he was there to make money and operate it.

Now, another thing I wanted to mention. Folks, if we
could -- you know, you heard that one marijuana plant equals
one pound of marijuana -- one pound of marijuana.

Well, Grow Room 23 had about, what was it, 815 plants. So
that room alone could produce about 800 pounds of processed
marijuana. I mean, at 200 pounds per trip, 15 trips, which is
the high end that he said, that's the 3,000 pounds of
marijuana.

It's as if this room just magically disappeared, what,
four times without Jeff Weng knowing? No. He knew. He was
the manager.

So there's a lot about this, you know, street value. I
think we can use our common sense and know that it's a lot of
product and it's expensive.

So, folks, you heard the evidence and I want you to
just -- when you deliberate to rely on your collective memory

1  and look at those exhibits and you'll see that the evidence

2  here shows that -- that we carried our burden and we -- we

3  embrace that burden, and that the evidence shows that beyond a

4  reasonable doubt that Jeff Weng is guilty of the drug

5  conspiracy charge.

6      In fact, ladies and gentlemen, you have heard all the

7  witnesses, seen these exhibits.  I submit the only verdict

8  consistent with the law is to find Jeff Weng and Tong Lin

9  guilty of conspiracy with intent to distribute marijuana plants

10  between December 2022 and May 17, 2023.

11      Thank you.

12          THE COURT:  Ladies and gentlemen, in a moment the

13  bailiff will escort you to the jury room and provide each of

14  you with a copy of the instructions that I have just read.

15      Any exhibits admitted into evidence will also be available

16  for your review.

17      If any of you have cell phones or similar devices with

18  you, you are instructed to be sure they are turned off and

19  given to the bailiff prior to entering the deliberation room.

20  Your cell phones will be secured by the bailiff during your

21  deliberations.  You will not be allowed to access them during

22  your deliberations.

23      They will be returned to you after your deliberations are

24  completed or during any break or similar period when you are

25  not deliberating.

1       The purpose of this requirement is to avoid any

2  interruption or distraction during your deliberations, and to

3  avoid any question of outside contact with the jury during your

4  deliberations.

5       You will note from the oath about to be taken by the

6  bailiff that during the course of your deliberations the

7  bailiff and other persons are forbidden from communicating in

8  any way or manner with any member of the jury on any subject

9  touching the merits of the case.

10      When you go to the jury room, you should first select a

11  foreperson who will help to guide your deliberations and will

12  speak for you here in the courtroom.

13      The second thing you should do is review the instructions.

14  Not only will your deliberations be more productive if you

15  understand the legal principles upon which your verdict must be

16  based, but for your verdict to be valid you must follow the

17  instructions throughout your deliberations.

18      Remember, you are the judges of the facts, but you are

19  bound by your oath to follow the law stated in the

20  instructions.  To reach a verdict, whether it is guilty or not

21  guilty, all of you must agree.  Your verdict must be unanimous.

22      Your deliberations will be secret.  You will never have to

23  explain your verdict to anyone.

24      You must consult with one another and deliberate in an

25  effort to reach agreement, if you can do so.

1    Each of you must decide the case for yourself, but only

2 after an impartial consideration of the evidence with your

3 fellow jurors.

4    During your deliberations, do not hesitate to re-examine

5 your own opinions and change your mind if convinced that you

6 are wrong, but do not give up your honest beliefs solely

7 because of the opinion of your fellow jurors or for the mere

8 purpose of returning a verdict.

9    Remember, at all times, you are judges, judges of the

10 facts.  You must decide whether the government has proved the

11 defendants guilty beyond a reasonable doubt.

12    A verdict form for each defendant has been prepared for

13 your convenience.

14    The foreperson will write the unanimous answer of the jury

15 in the space provided for Count 1 of the indictment, either a

16 not guilty or guilty.

17    At the conclusion of your deliberations, the foreperson

18 should sign and date the verdict forms.  If you need to

19 communicate with me during your deliberations, the foreperson

20 should write the message and give it to the bailiff.  I will

21 either reply in writing or bring you back into the court to

22 respond to your message.

23    Under no circumstances should you reveal to me the

24 numerical division of the jury.

25    The bailiff will come forward and be sworn.

1        (Bailiff sworn.)

2            THE COURT:  Members of the jury, here shortly you

3   will follow the bailiff to the deliberation room where you will

4   commence your deliberations.

5        My two alternate jurors, if you would remain in the

6   courtroom, please.

7        All persons in the courtroom will please remain seated

8   until the jury has retired.

9        (Jury retired to deliberate at 3:38 p.m.)

10           THE COURT:  As alternate jurors, depends on who you

11  ask, you either have the best job or the worst job.  I want to

12  tell you how much the Court appreciates you being here, and I

13  also want to tell you how important it is to have alternate

14  jurors.

15       I know you listened to all of the evidence and then you

16  don't go back and deliberate, but the fact is if for any reason

17  we had lost jurors and had to replace jurors, without the

18  presence of alternate jurors we would very likely have to have

19  a mistrial, start this all back over again at taxpayer expense

20  and effort and the time of all the parties and lawyers.  And so

21  the role of an alternate juror is incredibly important.

22       Even though we didn't end up needing to replace anyone on

23  the jury with you, the fact that you are here is a tremendous

24  insurance policy that we do in every case, and I sincerely

25  appreciate your willingness and your effort to be here.

1    You are free to go now.  You do not need to go back to the
2  jury assembly room.  You are free to go.
3    If you want to leave your notebooks in your chairs, your
4  notes will be destroyed.  No one will read them.  But again,
5  thank you very much for your willingness to serve.  It was very
6  important.
7    Court will remain seated while the alternate jurors leave.
8  Thank you again very much.
9    (Alternate jurors dismissed.)
10    THE COURT:  Let me ask counsel, if you would,
11  please, be sure that Marcia has your contact information, and
12  please don't go very far.
13    If you can be somewhere where we can -- if the jury has a
14  question or a verdict, where we could get you back here
15  reasonably short order.
16    Counsel, don't go back to Miami or Philly.
17    Other than that, anything else before we adjourn?
18    MR. MCGARRY:  Not from the government, Your Honor.
19    MR. HENRY:  No, Your Honor.
20    MR. GALLON:  No, Your Honor.
21    THE COURT:  Court's in recess.
22    (Break taken from 3:41 p.m. to 4:54 p.m.)
23    THE COURT:  Ladies and gentlemen of the jury, have
24  you reached a unanimous verdict?
25    JUROR GRAY:  Yes we have, Your Honor.

1          THE COURT:  Could I have the foreman please hand

2     the verdict to my bailiff?

3          I'll now read the verdict as follows.

4          In the United States District Court for the Western

5     District of Oklahoma, the United States of America, plaintiff,

6     vs. Jeff Weng, defendant, Case No. CR-23-237.

7          Verdict:  Count 1, drug conspiracy.  We the jury, duly

8     empanelled and sworn in the above-entitled cause, upon our

9     oaths unanimously find defendant Jeff Weng on the charge of

10    conspiracy to possess with intent to distribute and

11    distribution of controlled substances in violation of Title 21,

12    United States Code, Section 841(a)(1), as charged in Count 1,

13    guilty.

14         If, and only if, you have found defendant Jeff Weng guilty

15    of Count 1, what drug quantity, and specifically marijuana

16    plants, do you find beyond a reasonable doubt was involved in

17    the conspiracy from and after the date that defendant became a

18    member of the conspiracy?  Your finding must be unanimous.

19         If you found defendant Jeff Weng not guilty of Count 1,

20    then do not complete the following question.

21         1,000 or more marijuana plants.

22         Dated and signed by the foreperson of the grand -- of the

23    jury.

24         In the United States District Court for the Western

25    District of Oklahoma, United States of America, plaintiff, vs.

1  Tong Lin, defendant, Case No. CR-23-237.

2      Verdict:  Count 1, drug conspiracy.  We, the jury, duly

3  empanelled and sworn in the above-entitled cause, upon our

4  oaths unanimously find defendant Tong Lin, on the charge of

5  conspiracy to possess with intent to distribute and

6  distribution of controlled substances, in violation of Title

7  21, United States Code, Section 841(a)(1), as charged in Count

8  1, guilty.

9      If, and only if, you have found defendant Tong Lin guilty

10  of Count 1, what drug quantity, and specifically marijuana

11  plants, do you find beyond a reasonable doubt was involved in

12  the conspiracy from and after the date defendant became a

13  member of the conspiracy.  Your finding must be unanimous.  If

14  you found defendant Tong Lin not guilty of Count 1, then do not

15  complete the following question.

16      1,000 or more marijuana plants.  Dated and signed by the

17  foreperson of the grand (sic) jury.

18      Ladies and gentlemen, as you know, your verdict must be

19  unanimous.  Is this the verdict of each and every one of you?

20      (All jurors affirmed.)

21          THE COURT:  Counsel, anything more before I

22  discharge the jury?

23          MR. MCGARRY:  Nothing from the government, Your

24  Honor.

25          MR. HENRY:  Nothing from me, Your Honor.

1          MR. GALLON:  No, Your Honor.

2          THE COURT:  Thank you.

3      Ladies and gentlemen, your service as jurors in this case

4  has demonstrated your willingness to accept an important

5  responsibility and to contribute to the administration of

6  justice.

7      I hope that your service as a juror has been pleasant and

8  beneficial to you in providing an opportunity to learn a little

9  more about our courts and our system of justice.

10     You have provided dedicated service to your community and

11 I personally thank you for your service as jurors to the Court.

12     Now that you have discharged your service, you are free to

13 discuss the case.  You are not obligated to discuss the case at

14 all.

15     If anyone attempts to question your verdict or make any --

16 anything like that -- anything you have done in the case,

17 please make that known to me as soon as possible.  The rules of

18 this Court prohibit the lawyers or anyone on their behalf from

19 talking to you without my permission.

20     If anything is attempted like that, that should be made

21 known to me immediately.

22     You do not need to return to the jury assembly room.  You

23 are discharged and you are free to go.  Again, thank you very

24 much.

25     Court will remain in attendance and seated while the jury

1  leaves.

2      (Jury exited at 4:59 p.m.)

3          THE COURT:  Does either counsel care to see the

4  original verdict forms?

5          MR. HENRY:  No, Your Honor.

6          MR. MCGARRY:  No, Your Honor.

7          MR. GALLON:  No, Your Honor.

8          THE COURT:  The clerk will file the verdict forms.

9      Mr. Weng and Mr. Lin, you have heard the verdict.  The

10 Court will refer the case to the probation office for

11 preparation of a presentence investigation and report.

12     They will ask you to provide some information for that

13 report, and I will ask you and your counsel to begin that

14 process as soon as you are contacted by the probation office.

15     A date for sentencing will be set.  You and your counsel

16 will have the opportunity to read the presentence investigation

17 report and file any objections you have to the information it

18 contains prior to sentencing.

19     You and your counsel will also have the opportunity to

20 speak on your behalf at the sentencing hearing.

21     For both Mr. Weng and Mr. Lin, the charge for which you

22 have been convicted is one that carries mandatory detention,

23 and so you will both be remanded to the custody of the United

24 States marshals at this time.

25     Is there anything further from either party?

1          MR. MCGARRY:  Not from the government, Your Honor.

2          MR. HENRY:  No, Your Honor.

3          MR. BENNETT:  No, Your Honor.

4          THE COURT:  Counsel, thank you all for a -- a very

5    professionally tried case.  You all represented your clients

6    well and I appreciate your efforts.

7        Court will be in recess.

8        (Court adjourned.)

9                    REPORTER'S CERTIFICATION

10          I, Emily Cripe, Federal Official Realtime Court

11   Reporter, in and for the United States District Court for the

12   Western District of Oklahoma, do hereby certify that pursuant

13   to Section 753, Title 28, United States Code that the foregoing

14   is a true and correct transcript of the stenographically

15   reported proceedings held in the above-entitled matter and that

16   the transcript page format is in conformance with the

17   regulations of the Judicial Conference of the United States.

18                    Dated this 25th day of March, 2024.

19

20

21                    **/S/ Emily Cripe**
                      EMILY CRIPE, CSR
22                    Federal Official Court Reporter

23

24

25